In re Arthur R. **MILLER** and Janet E. Miller, Debtors.

**EQUITABLE BANK, Plaintiff–Appellee,**

v.

Arthur R. **MILLER,** and Janet E. Miller, Defendants–Appellants.

No. 93–4933.

United States Court of Appeals, Eleventh Circuit.

Dec. 5, 1994.

---

Charles R. Throckmorton, Miami, FL, for appellants.

Bruce D. Fischman, Craig B. Sherman, Sherman & Fischman, P.A., Miami, FL, for appellee.

Before KRAVITCH and BIRCH, Circuit Judges, and HOEVELER *, Senior District Judge.

KRAVITCH, Circuit Judge:

Appellants Dr. Arthur Miller and Janet Miller, husband and wife, appeal from the district court's ruling that their debt to appellee Equitable Bank was non-dischargeable in bankruptcy. For the reasons stated below, we REVERSE and REMAND.

## I.

Soon after appellee Equitable Bank commenced operation in 1987, one of its vice-presidents contacted appellant Dr. Arthur Miller and convinced him to begin a financial relationship with the bank. At that time,

Miller, a radiologist by profession, had substantial real estate holdings as well as an ownership interest in several automobile dealerships, including Isuzu and Suzuki franchises.

Dr. Miller submitted to Equitable tax returns and a financial statement, co-signed by his wife Janet Miller,[1] which represented their net worth at over $5,000,000.00. Equitable subsequently granted the Millers a $150,000.00 loan, unsecured by collateral. In 1988, the Millers applied for and were granted an additional $100,000.00 line of credit on an unsecured basis. It is undisputed that the Millers repaid both of these loans in a timely fashion.

During 1989 and 1990, Equitable granted the Millers three more loans—which remain outstanding—after the Millers submitted updated financial statements. These financial statements were deficient in two important, related respects. First, they were incomplete in that they omitted any specific reference to considerable financial liabilities. Most significantly, the Millers failed to list somewhat over $1,500,000.00 in promissory notes which the Millers had executed between 1986 and 1989, some in their own names and others through "Miller Suzuki." Although all of these notes were issued prior to the Millers' submission of their 1989 and 1990 financial statements, none of these transactions were listed on the statements. Dr. Miller did, however, type the word "NET" underneath the estimated values of the Millers' auto franchises; similarly, he left blank the spaces titled "amount mortgage or lien." Equitable also alleges that the Millers failed to list on their statements a Personal Guaranty to World Omni Financial Corporation in the amount of $2,500,000.00, apparently akin to a secured line of credit.

A second, related deficiency on the statements was that Dr. Miller's estimates as to the values of several of the businesses, particularly the Suzuki and Isuzu franchises and a company called "Miller Equipment," were

* Honorable William M. Hoeveler, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Janet Miller is a co-appellant, and was listed as a co-owner of several of the Millers' businesses, including the Isuzu franchise and "Miller Equipment." The record supports the bankruptcy court's finding, however, that Janet Miller did not participate in the businesses beyond signing her name to relevant documents.

much greater than the values ultimately indicated on the Millers' bankruptcy schedule and tax returns for 1989 and 1990. On the 1990 financial statement, Dr. Miller estimated the net worth of his Isuzu franchise to be $450,000.00—the Millers' purchase price—but his 1990 tax return indicated a 1990 operating loss of $455,281.00, and negative retained earnings of nearly $1,000,000.00; he estimated the Suzuki franchise's net worth at $150,000.00, although it had negative retained earnings in 1990 of over $1,300,000.00; and he estimated the value of Miller Equipment at $500,000.00, although it had negative retained earnings of $81,994.00.

By 1990, the poor performance of the Millers' auto and jeep franchises was creating an enormous drain on their finances. Dr. Miller attempted to deal with the businesses' financial distress by selling the Millers' Bal Harbour, Florida home and liquidating his pension fund, placing over $2,500,000.00 in proceeds into his failing auto franchises. In addition, in February 1991, Dr. Miller attempted a partial workout with the Millers' largest creditor, his medical partner Dr. Sylvan Sarasohn. Sarasohn held two promissory notes against Miller Suzuki totalling $1,105,000.00. In exchange for cancellation of these notes, Miller transferred nine properties to Sarasohn.

On November 1, 1991, the Millers filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Florida. Equitable filed a proof of claim for $653,823.33 based on the Millers' unpaid loans, and argued that the Millers' debt to it was non-dischargeable under 11 U.S.C. § 523(a)(2)(B) and 11 U.S.C. § 727(a)(2)(A). The bank alleged, *inter alia,* that the Millers' deficient financial statements and their transfer of property to Sarasohn both were designed to defraud Equitable of funds owed to it.

After a bench trial, the bankruptcy court held the Millers' debt to be dischargeable under both § 523(a)(2)(B) and § 727(a)(2)(A). The district court reversed, concluding that the bankruptcy court's findings on both grounds were clearly erroneous. The Millers appeal from the district court's order.

## II.

Under 11 U.S.C. § 523(a)(2)(B), a debt is non-dischargeable in bankruptcy where it was obtained by a writing: (1) that is materially false; (2) respecting the debtor's or an insider's financial condition; (3) on which the creditor to whom the debt is liable for such money, property, services, or credit reasonably relied; and (4) that the debtor caused to be made or published with the intent to deceive. The objecting creditor has the burden of proving each of these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). If any one of these elements is not met, the debt is dischargeable. Moreover, courts generally construe the statutory exceptions to discharge in bankruptcy "liberally in favor of the debtor," and recognize that " '[t]he reasons for denying a discharge ... must be real and substantial, not merely technical and conjectural.' " *In re Tully,* 818 F.2d 106, 110 (1st Cir.1987) (quoting *Dilworth v. Boothe,* 69 F.2d 621, 624 (5th Cir.1934)); *see also Boyle v. Abilene Lumber, Inc. (Matter of Boyle),* 819 F.2d 583, 588 (5th Cir.1987). This narrow construction ensures that the "honest but unfortunate debtor" is afforded a fresh start. *Birmingham Trust Nat'l Bank v. Case,* 755 F.2d 1474, 1477 (11th Cir.1985); *see also Caspers v. Van Horne,* 823 F.2d 1285, 1287 (8th Cir. 1987) ("[E]vidence presented must be viewed consistent with congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code."). We confine our analysis in this case to the district court's reversal of the bankruptcy court's finding that the fourth element under 11 U.S.C. § 523(a)(2)(B), "intent to deceive," was not met.

Whether a debtor in bankruptcy acted with the requisite "intent to deceive" under § 523(a)(2)(B) is an issue of fact, and the bankruptcy court's findings as to this issue are reviewed by both the district and appellate courts under the clearly erroneous standard. *See Matter of Martin,* 963 F.2d 809, 814 (5th Cir.1992); *In re Liming,* 797 F.2d 895, 897 (10th Cir.1986); *In re Long,* 774 F.2d 875, 877–78 (8th Cir.1985); *see also*

*Birmingham Trust*, 755 F.2d at 1477 (applying clearly erroneous standard to bankruptcy court's finding of "reckless disregard of truth" under § 523(a)(2)(A)). "Because a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor, deference to the bankruptcy court's factual findings is particularly appropriate." *In re Burgess*, 955 F.2d 134, 137 (1st Cir.1992) (citing *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir.1987)); *see also Martin*, 963 F.2d at 814; *see generally* Bankruptcy Rule 8013.[2]

█ The district court therefore acts as an appellate court in reviewing a bankruptcy court's factual findings. To ensure proper deference to the bankruptcy court, we in turn must review *de novo* a district court's holding that a bankruptcy court's factual findings were clearly erroneous. *See In re Sublett*, 895 F.2d 1381, 1384 (11th Cir.1990) (" '[A]s the second court of review,' this Court's review of the district court's decision is entirely *de novo*.") (quoting *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir.1987)).

█ A bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive. "Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inferrence [sic] of intent [to deceive]." *In re Albanese*, 96 B.R. 376, 380 (Bankr. M.D.Fla.1989) (citations omitted); *see also Florida Nat'l Bank v. Gordon*, 91 B.R. 135, 138 (Bankr.N.D.Fla.1988); *Brigadier Homes v. Hert*, 81 B.R. 638, 641 (Bankr.N.D.Fla. 1987); *Matter of Archer*, 55 B.R. 174, 179–80 (Bankr.M.D.Ga.1985).[3]

█ The bankruptcy court in this case determined, based largely on Dr. Miller's testimony, that the Millers did not act with an intent to deceive in omitting the promissory notes from their financial statements and/or overvaluing their assets. The court found that their failure to list the promissory notes occurred because they "netted [the notes] ... against the value of the assets." The bankruptcy court further found that "[i]n [Dr. Miller's] view, it was a reasonable thing to do, to state the values on the net basis as he did ... even though an accountant might have ... done it somewhat differently." The court concluded that under the circumstances, Dr. Miller "had some reasonable basis for what were the assets," and "some reasonable basis to determine the values that were attached to them." In rejecting a finding of intent to deceive, the court attached particular significance to the fact that Dr. Miller had "used substantial amounts of his own exempt assets to attempt to salvage the ... businesses which, of course, is directly contrary to one who would have an intent to deceive." The district court reversed, holding that it was clearly erroneous for the bankruptcy court to fail to infer intent to deceive from the Millers' omission of the promissory notes from their financial statements. The district court did not cite specifically to any evidence in the record, but merely noted that given Dr. Miller's "extensive business background" there was a strong inference of his intent to deceive. As to Janet Miller, the district court held that given her co-signature of the loans, "she may not avoid responsibility as a spouse simply because she may not have been a knowing participant in the misrepresentations."

The bankruptcy court's finding that the Millers lacked an intent to deceive was not clearly erroneous. It is plausible that the Millers' financial estimates, though perhaps

2. "On an appeal the district court or bankruptcy appellate panel may affirm, modify or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Bankruptcy Rule 8013.

3. *See also In re Woolum*, 979 F.2d 71, 73–74 (6th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993); *In re Liming*, 797 F.2d 895, 897 (10th Cir.1986); *Carini v. Matera*, 592 F.2d 378, 380–81 (7th Cir.1979); *In re Houtman*, 568 F.2d 651, 655–56 (9th Cir.1978).

careless or presumptuous, were made without dishonest intent. As the bankruptcy court recognized, Dr. Miller offered reasons for each substantial contested entry and omission. As to the failure to list the promissory notes, for instance, Dr. Miller testified that although he had not listed them individually, he generally—albeit not precisely—had included the debts into the dealerships' "net value."[4] That Dr. Miller wrote the word "NET" in capital letters on the financial statements, underneath his estimates, supports his testimony that he attempted to "net" his businesses' values. So, too, does the fact that he left blank the spaces titled "amount mortgage or lien." Further, as Miller pointed out at trial, he similarly had omitted from the statements his personal investment of over $2,500,000.00 in personal assets into the auto dealerships. Similarly, Dr. Miller explained that the Millers' $2,500,-000.00 Personal Guaranty to World Omni, unlisted on their statements, was fully "netted" against $2,500,000.00 worth of inventory against which it was secured.

As to the asserted overvaluation of the Millers' Suzuki and Isuzu franchises and Miller Equipment, Dr. Miller explained at trial that he had valued these businesses based on his investment in them and/or his purchase price. He assertedly did not base his estimates on the businesses' operating loss figures because he had been told that it took between three and five years for such franchises to begin showing a profit. Whether or not accurate, it was neither *per se* reckless nor deceitful for Dr. Miller to have based his businesses' valuations on their purchase prices and his investment in them, rather than their present operating revenues. *Accord Martin*, 963 F.2d at 814 (affirming

bankruptcy court's determination that debtor who omitted several liabilities from financial statements, and substantially overestimated his property and net worth, did not intend to defraud creditor).

As to Janet Miller, her participation in the Millers' financial matters was extremely minimal, apparently limited to signing her name on relevant co-signatory and co-ownership documents; there therefore is no independent reason contrary to the foregoing analysis to deny her discharge in bankruptcy as to the contested debts. Consequently, for all of the above reasons, we hold that the district court erred in reversing the bankruptcy court's finding that the Millers lacked the requisite intent to deceive under 11 U.S.C. § 523(a)(2)(B).[5]

## III.

■ Equitable alternatively argues that the Millers' debts are non-dischargeable under 11 U.S.C. § 727(a)(2)(A), which provides:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor with the intent to hinder, delay, or defraud the creditor or an officer of the estate ... has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor within one year before the date of the filing of the petition[.]

A creditor alleging intent to defraud under § 727(a)(2)(A) bears the considerable burden of demonstrating *actual fraudulent intent;* constructive fraud is insufficient. *See In re Wines*, 997 F.2d 852, 856 (11th Cir.1993)

---

4. On cross-examination, Miller offered the following testimony:

THE WITNESS: [O]n my accounts, the way I understood it, I listed the fact that I owned these companies and I listed what I thought was the correct market value.

I didn't list the fact that family had put money in there. I didn't list the fact I had put $2 million of my pension fund into it. I didn't mention the fact I put $500,000 from my house into the business....

I listed what I thought was the net worth of them, and you can say well, one lost a million,

one lost five-hundred, but that was all money that I had invested and my family had invested in these companies at this particular time.

To the best of my knowledge this was the net worth of those companies.

Tr. 155. Miller offered similar testimony throughout both his cross and direct examination.

5. We therefore need not address whether the district court was correct in reversing the bankruptcy court as to the other elements of § 523(a)(2)(B).

(citations omitted). As is the case under § 523(a)(2), the bankruptcy court's determination of whether a debtor acted with the requisite intent is a question of fact reviewed for clear error by the district and appellate courts. *Id.*

Equitable alleges that the Millers' transfer of nine properties to Sarasohn in exchange for cancellation of $1,105,000.00 of unsecured debt was intended to defraud Equitable. Equitable contends that the transaction is suspect because the properties were sold for approximately $635,000.00 less than their value as reflected on the Millers' financial statements. Equitable points out that even Dr. Miller's own real estate partner, Alan Kornbluh, testified that he had valued the properties at a figure approximately $300,000.00 greater than the transfer price. In addition, Equitable contends that the close professional relationship between Sarasohn and Miller, along with the fact that the Millers never listed the Sarasohn debts on their financial statements, raises a necessary inference of intent to defraud.

The bankruptcy court rejected the bank's arguments and held that in effecting the property transfer, the Millers did not act with fraudulent intent. That court further found that although the transfer price was lower than the appraisal value, it was reasonable under the circumstances, particularly given "that Sarasuhn [sic] was, in effect, exchanging a liquid asset for an illiquid one, there were interest factors to be involved, [and] there were declining values in place at the time." The district court reversed this holding as clearly erroneous, and reasoned that the "totality of the circumstances" surrounding the transfer were "highly suspect."

We conclude that the bankruptcy court's grant of discharge under § 727(a)(2)(A) was not clearly erroneous. There are several plausible reasons why the estimates offered by Kornbluh and those given by the Millers on their statements exceeded the transfer values. Dr. Miller testified that real estate values in Florida were beginning to plunge; that he nonetheless valued the properties at eight times rent roll—a standard valuation method; and that he then discounted the price to reflect Sarasohn's expected return on the promissory notes being canceled. That Dr. Miller's estimated values are at odds with other viable estimates therefore is not dispositive evidence that he acted with fraudulent intent. *Cf. Wines,* 997 F.2d at 856–57 (undervaluation of debt did not justify denial of discharge under § 727 where bankruptcy court accepted debtor's explanation).

Moreover, the record reasonably suggests that the Millers' motivation in effecting the transfer was to obtain funds to keep their businesses alive while satisfying their largest creditor, Sarasohn. A mere preferential transfer of this sort is not tantamount to a fraudulent transfer for the purposes of denying discharge. *See Matter of Reddington,* 36 B.R. 62, 65 (Bankr.S.D.Fla. 1984); *In re O'Connor,* 32 B.R. 626, 628 (Bankr.E.D.Pa.1983); 4 Collier on Bankruptcy § 727.02[3] (15th Ed.1994). Likewise, that the transfers here were made to an apparently bona fide creditor distinguishes this case from those involving pre-bankruptcy transfers to non-creditors and/or family members, which merit closer scrutiny. *Compare, e.g., In re Coggin,* 30 F.3d 1443 (11th Cir.1994) (denial of discharge under § 727(a)(2)(A) where insolvent debtor made pre-petition transfer to son); *In re Davis,* 911 F.2d 560 (11th Cir.1990) (denial of discharge where debtor transferred interest in marital home to wife).

Accordingly, we conclude that the district court erred in reversing the bankruptcy court's finding that the Millers lacked the requisite intent to defraud under 11 U.S.C. § 727(a)(2)(A).

### IV.

Based on the foregoing discussion, we REVERSE the ruling of the district court and REMAND for proceedings consistent with this opinion.