**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: RANDALL E. DALTON,
<u>Debtor.</u>

CONSOLIDATED BANK AND TRUST
COMPANY,                                             No. 99-1330
<u>Plaintiff-Appellant,</u>

v.

RANDALL E. DALTON,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-98-659-3, BK-95-30883-T, AP-95-3072-T)

Argued: October 26, 1999

Decided: February 17, 2000

Before MURNAGHAN, WILKINS, and TRAXLER, Circuit Judges.

_____

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Lawrence Douglas Wilder, Jr., WILDER & GREGORY,
Richmond, Virginia, for Appellant. Richard Robert James, Glen
Allen, Virginia, for Appellee. **ON BRIEF:** Gerald W.S. Carter, WIL-
DER & GREGORY, Richmond, Virginia, for Appellant.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The plaintiff, Consolidated Bank & Trust Co. ("the Bank"), appeals the district court's order affirming the bankruptcy court's determination that Dr. Randall E. Dalton's ("Dalton") debt to the Bank was dischargeable in bankruptcy. Because we hold that the bankruptcy court's findings were clearly erroneous, we reverse and remand.

I.

Dalton is a physician practicing in Richmond, Virginia. From 1986 until 1993, he practiced medicine as a corporation, Ear, Nose, Throat, Head & Neck Medicine and Surgery of Richmond, Inc. ("ENT Medicine"). Dalton was the President, sole director, and sole shareholder of ENT Medicine.

Between 1986 and 1992, ENT Medicine obtained loans from the Bank to finance Dalton's medical practice. Dalton and his wife personally guaranteed all of ENT Medicine's debts. By early 1992, ENT Medicine's loans from the Bank were in arrears. Dalton claims that the cause of the corporation's financial problems was the failure of ENT Medicine's time-and-billing computer system in June 1991. The computer crash caused ENT Medicine to lose thousands of dollars in accounts receivable.

On November 25, 1992, Dalton and his accountant, Brian LaLonde ("LaLonde"), met with two individuals from the Bank to discuss restructuring the loans. Mr. Henley, the Bank's chairman of the board of directors, and Mr. Winston, the assistant vice president of the Bank's loan review program, represented the Bank. The Bank required Dalton to provide financial statements before it would restructure the loans. Dalton and LaLonde prepared two financial statements for the Bank.

2

Both financial statements contained an entry that listed a "loan to stockholder" as one of the assets of ENT Medicine. The loan to stockholder entry on the November 30, 1992 financial statement listed a balance of $249,014.52. The total assets of ENT Medicine as of November 30, 1992 were $275,041.23. The "loan to stockholder" asset thus amounted to approximately 91% of the total assets of ENT Medicine as of that date.

Dalton concedes that the "loan to stockholder" was not really a loan from ENT Medicine to Dalton. Instead, Dalton received the amounts listed in the loan to stockholder entries as his salary. Dalton wrote checks to himself from ENT Medicine's account that he notated as salary. LaLonde characterized Dalton's salary as a"loan to stockholder" on ENT Medicine's financial statements because it allowed Dalton to defer his payroll tax liability. Dalton owed a lot of money to the IRS for back taxes, and LaLonde did not believe that Dalton could meet his obligations if his payroll tax liability increased.[1]

During the restructuring of Dalton's loans, the Bank was not aware that the "loan to the stockholder" was, in reality, salary paid to Dalton. The Bank thought that the "loan" was an asset of ENT Medicine. Had Dalton and LaLonde listed the "loan to stockholder" entries properly, ENT Medicine would have been insolvent as of November 30, 1992 because its liabilities would have exceeded its assets by over $214,000. Consequently, the Bank would not have restructured the loan to Dalton had it known that the "loan to stockholder" was not really an asset of ENT Medicine.

Both Dalton and LaLonde were aware that the "loan to stockholder" entries were an incorrect characterization of Dalton's salary. Dalton was also aware that the Bank was relying on the data in the financial statements in deciding whether to restructure his loans. Nevertheless, neither Dalton nor LaLonde informed the Bank about the true nature of the "loan to stockholder" entries.

_____

[1] A true "loan to stockholder" would have been supported by a loan agreement or promissory note, with specified repayment terms and an arms-length interest rate. Dalton did not comply with any of these formalities.

3

The Bank ultimately agreed to restructure Dalton's loans. The parties restructured three loans and a line of credit by combining the four bad debts into one. ENT Medicine executed a new note secured by its corporate assets, and both Dalton and his wife supplied personal guarantees. The Loan Restructure Agreement that Dalton signed contained the following proviso:

> The information that has been furnished to the Bank by the Borrowers in connection with the restructure of the Notes is accurate in all material respects and does not contain any untrue statements of a material fact or omit to state any material fact necessary to make such statements, in light of the circumstances under which they were made, not misleading.

By May of 1993, Dalton was in default under the Restructure Agreement. On March 9, 1995, Dalton filed for bankruptcy under chapter 7. On June 12, 1995, the Bank brought adversary proceedings to exclude Dalton's debt to the Bank from discharge under § 523(a)(2)(B).[2] The Bank argued that Dalton's debt to the Bank should be excluded from discharge because the "loan to stockholder" entries on ENT Medicine's financial statements were false representations made with the intent to deceive the Bank.

On September 30, 1996, the bankruptcy court found that the loan to stockholder entries were materially false statements respecting ENT Medicine's financial condition. The bankruptcy court also found that the Bank reasonably relied on the loan to stockholder entries in restructuring Dalton's loans. The court nevertheless held that Dalton's debt to the Bank was dischargeable because it found that the Bank had failed to establish that Dalton intended to deceive the Bank.

On January 22, 1997, the Bank appealed to the district court, which held that the bankruptcy court's finding that Dalton did not intend to deceive the Bank was clearly erroneous. The district court therefore

_____

[2] The Bank also attempted to exclude the debt from discharge based on other subsections of § 523(a). The Bank's argument under § 523(a)(2)(B), however, is the only basis for exclusion raised in the instant appeal.

4

reversed and remanded the case to the bankruptcy court for a determination of the amount of the debt that would be excluded from discharge under § 523(a)(2)(B).

The bankruptcy court entered an order on remand granting judgment in favor of the Bank for $338,619.19. Dalton appealed to the district court. The district court, with a new judge hearing the appeal, reversed its original finding in favor of the Bank and held that Dalton's debt to the Bank should be discharged because the bankruptcy court's original finding of no intent to deceive was not clearly erroneous. The Bank appeals, arguing that the bankruptcy court's finding that Dalton did not intend to deceive the Bank was clearly erroneous.

II.

The Bank argues that Dalton's debt to the Bank should be excluded from discharge under § 523(a)(2)(B) of the Bankruptcy Code. Section 523(a)(2)(B) provides:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt--
>
> . . . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> . . . . .
>
> (B) use of a statement in writing--
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

5

> (iv) that the debtor caused to be made or published with intent to deceive; . . . .

11 U.S.C. § 523(a)(2)(B). A creditor attempting to exclude a debt from discharge under § 523(a)(2)(B) has the burden of proving each of these elements by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 291 (1991). The bankruptcy court held that the Bank established the first three elements of § 523(a)(2)(B). The court, however, found that the Bank did not establish that Dalton intended to deceive the Bank. Intent to deceive is the only element at issue in the instant appeal.

In bankruptcy cases, we "review de novo the decision of the district court, effectively standing in its place to review directly the findings of fact and conclusions of law made by the bankruptcy court." Butler v. David Shaw, Inc., 72 F.3d 437, 440 (4th Cir. 1996). Rule 8013 of the Federal Rules of Bankruptcy Procedure sets out the standard of review of a bankruptcy court's judgments. Rule 8013 provides that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013. A trial court's findings of fact are clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." In re Green, 934 F.2d 568, 570 (4th Cir. 1991). The Supreme Court has stated "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985). We review the bankruptcy court's legal conclusions de novo. See In re Weiss, 111 F.3d 1159, 1166 (4th Cir. 1997).

A debtor will rarely admit that he intended to deceive a creditor. Courts have thus held that intent to deceive under § 523(a)(2)(B) can be inferred from the totality of the circumstances surrounding the debtor's acts, including the debtor's knowledge of or reckless disregard for the accuracy of his financial statements. See In re Cohn, 54 F.3d 1108, 1119 (3d Cir. 1995) ("[A] creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of, the accuracy of the information in the financial statement of the debtor when the totality of the circumstances supports such an infer-

6

ence."); In re Miller, 39 F.3d 301, 305 (11th Cir. 1994) ("Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inferrence [sic] of intent [to deceive].") (quoting In re Albanese, 96 B.R. 376, 380 (Bankr. M.D. Fla. 1989) (correction in original)); In re Batie, 995 F.2d 85, 90 (6th Cir. 1993) ("[S]ection 523(a)(2)(B)(iv) is met if a debtor is reckless when submitting financial statements that he knows are not true, not only if the debtor possesses a subjective intent to deceive.").

In the instant case, Dalton knew that the Bank was relying on his financial statements in deciding whether to approve the restructuring of his delinquent loans. Dalton also knew that LaLonde characterized his salary as a "loan to stockholder" for tax purposes. At trial, Dalton admitted that the term "loan to stockholder," without any background information, would mean a "loan to a stockholder." Nevertheless, Dalton failed to advise the Bank that the only significant asset of ENT Medicine was, in fact, a mischaracterization of Dalton's salary that Dalton used to stay ahead of the IRS. Dalton's failure to advise the Bank of the true nature of the "loan to stockholder" entries is especially troubling given that Dalton represented in the Restructure Agreement that the financial statements did not "omit to state any material fact necessary to make such statements, in light of the circumstances under which they were made, not misleading."

Dalton's mischaracterization of his salary as a "loan to stockholder" thus constituted, at a minimum, gross recklessness. Dalton's gross recklessness in submitting false financial statements creates an inference that he intended to deceive the Bank. See Batie, 995 F.2d at 90. Courts have found that the inference of an intent to deceive does not compel a finding of intent to deceive; rather, the bankruptcy court, in weighing the credibility of witnesses, has the discretion to find no intent to deceive if the debtor provides a reasonable basis for recklessly submitting a false financial statement. See, e.g., Miller, 39 F.3d at 305-06.

Here, however, Dalton's only explanation for submitting the false financial statements is that he relied on the advice of LaLonde. Dalton fails to recognize that "the ultimate responsibility for the omission of a material statement rests solely with the Debtor." In re Drehsen, 190

7

B.R. 441, 446 (M.D. Fla. 1995). Dalton cannot abdicate his responsibility for recklessly providing false information to the Bank by pointing his fingers at LaLonde. This principle is especially true in the instant case because Dalton is an educated man who was well aware of the dire financial situation of his business.

In sum, the only permissible view of the evidence is that Dalton intended to deceive the Bank by acting with gross recklessness in submitting false financial statements. Dalton seeks refuge in the fact that the clearly erroneous standard of review applies in the case at bar. The clearly erroneous standard of review, however, does not allow this court to blindly defer to the bankruptcy court's findings. Here, after reviewing the record as a whole, we are "left with the definite and firm conviction that a mistake has been committed." Green, 934 F.2d at 570. The bankruptcy court's finding that Dalton did not intend to deceive the Bank was clearly erroneous. We therefore hold that Dalton's debt to the Bank is nondischargeable under § 523(a)(2)(B).

III.

Because of the unique procedural posture of this case, Dalton has not had the opportunity to challenge the bankruptcy court's calculation of the amount of his nondischargeable debt to the Bank.[3] The judgment of the district court is therefore reversed and the case remanded to the district court where Dalton may again pursue his appeal of the amount of his debt to the Bank.

REVERSED AND REMANDED

_____

**3** On remand after the Bank's first appeal to the district court, the bankruptcy court held that the amount of Dalton's nondischargeable debt to the Bank was $338,619.19.