In re David Duane GUTHRIE, Liane Victoria Guthrie, Debtors.

James Overly, Plaintiff,

v.

David Duane Guthrie, Liane Victoria Guthrie, Defendants.

Bankruptcy No. 99–3414–WRS.
Adversary No. 99–165–WRS.

United States Bankruptcy Court, M.D. Alabama.

Aug. 3, 2001.

James L. Day, Montgomery, AL, for Debtors/Defendants.

Harold P. Turk, Montgomery, AL, for plaintiff.

### *MEMORANDUM DECISION*

WILLIAM R. SAWYER, Chief Judge.

This Adversary Proceeding came before the Court for trial, without a jury, on June 28, 2001. Plaintiff James Overly was present in person and by counsel Harold P. Turk. Defendants David Duane Guthrie and Liane Victoria Guthrie were present in person and by counsel James L. Day. Overly makes two claims: first, that the indebtedness owed him should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A); and second, that the Defendants' discharge should be denied pursuant to 11 U.S.C. § 727(a). The Court finds that the Plaintiff has failed to carry his burden of proof on both claims and, for that reason, the Plaintiff's complaint is DISMISSED, with prejudice. The Court will discuss the two claims separately below. This memorandum shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## I. THE SECTION 523(a)(2)(A) CLAIM

### *A. FINDINGS OF FACT*

In 1991, Defendant/Debtor David Guthrie incorporated "A. Computer Services,

Inc.," (ACSI) a small business which sold computers and related services to consumers and small businesses. The business began its operations in Jacksonville, Florida but was moved to Montgomery, Alabama corresponding to Guthrie's change in duty station. Guthrie was a Lt. Commander in the United States Navy, serving in Jacksonville but was later assigned to serve at Maxwell Air Force base in Montgomery. Guthrie was employed full time, or on active duty status, until he retired from the Navy in 1997. Guthrie was the president and owned a majority interest in ACSI. In 1997, ACSI rented commercial space for its office. Prior to that time, it had operated out of the garage or residence of either Guthrie or one of the other owners of the corporation.

In 1995, Plaintiff James Overly acquired 1,000 shares of common stock in ACSI (a minority interest) and was, at least by 1997, a full-time employee. Also in 1997, ACSI rented commercial office and retail space on Bell Road in Montgomery, Alabama. Business was good during 1997 and the early part of 1998. Due to competitive changes in the computer sales and service business, sales revenues declined considerably during the latter part of 1998, and as a result, the business experienced financial stress. Overly testified that he kept the books and records of the corporation and that he was familiar with the corporation's finances. When ACSI could not pay its rent, Guthrie considered closing the business in early 1999 and discussed the matter with Overly who offered to lend ACSI $11,000 for the purposes of paying the rent for the months of December, 1998 and January and February of 1999. Overly testified that it was he who approached Guthrie, offering to make the loan and further admitted that Guthrie did not solicit the loan or make any representations to entice him to make the loan. The only stipulations made at the time the loan was made were that the $11,000 was to be used to pay the rent of ACSI's place of business and that the money was to be paid back as soon as possible. (Plaintiff's Exhibit J). Overly does not contend that the $11,000 loaned by him to ACSI was not used to pay rent or that ACSI ever had the ability to repay the money but refused to do so.

Overly contends that Guthrie fraudulently enticed him to make the loan to ACSI by failing to make him a Vice President of the corporation. The evidence was undisputed that Guthrie told Overly, and others, that Overly was a Vice President of ACSI. Business cards were purchased by ACSI for Overly which identified him as a Vice President. A copy of such a business card was offered in evidence. (Defendant's Exhibit H). Overly and Guthrie together made business calls on behalf of ACSI. During those business meetings, Guthrie would introduce Overly as a Vice President. Both Guthrie and his wife, Liane Guthrie, a co-debtor and a co-defendant, testified that they considered Overly a Vice President of the corporation.

The only evidence that Overly offered in support of his contention that he was not, in fact, an officer of the corporation, were copies of ACSI's Annual Reports for the years 1997 and 1998. (Plaintiff's Exhibit H). ACSI was a Florida corporation and filed its Annual Reports with the Florida Secretary of State. The ACSI Annual Reports for 1997 and 1998 indicate that the officers and directors were David Guthrie and Peter Griffiths. Overly's name is not mentioned in either Annual Report.

It should be observed here what is not in the evidence, as well as what is. First, there is no evidence, or citation to authority, as to whether the Annual Report was required to list all officers of the corporation. The Court has not undertaken to research this question on its own but it will

not infer that such a requirement exists without some evidence or authority. As Guthrie has failed to offer any evidence on this point, and because he bears the burden of proof, the Court will not infer that Overly was not an officer of the corporation merely because the Annual Reports did not list his name.

Second, even if Florida law did require that each officer be listed on the annual report, it would not necessarily follow that Overly was not, in fact, an officer of the corporation. As a general rule, officers are made by action of the corporations Board of Directors or otherwise in accordance with the bylaws of the corporation. The failure to list Overly's name on the Annual Report, even if Florida law required that all officers be listed, does not necessarily mean Overly was not an officer. Given the facts of this case, the more logical inference to be drawn was that the Annual Report was in error. The Court finds that Overly has failed to prove that Guthrie's statements, to the effect that Overly was a Vice President of ACSI, were false.

At trial, Overly made repeated representations to the effect that ACSI was a "sham" corporation and suggested that Guthrie had somehow done something wrong in the operation of the business. The evidence established that ACSI was issued a corporate charter by the State of Florida, that ACSI filed Annual Reports with the Florida Secretary of State and that meetings of shareholders and directors were held on a regular basis.[1] Ov-

erly failed to support his claim that ACSI was a "sham" with any evidence. To the contrary, the evidence showed that ACSI's corporate existence was honored and that the corporation was not merely Guthrie's alter ego. Overly's assertion that ACSI was a "sham" is without merit.

Overly's Section 523(a)(2) claim fails at the outset for want of a false statement. As no false statement was made, the Court does not reach the questions of intent, reliance and nexus. However, it will comment that having heard all of the evidence, observed the demeanor and bearing of the witnesses and examined all of the documents, the Court finds that Guthrie was forthright and credible and that he did not intend to cause harm to Overly. On the other hand, the Court could not help but note that Overly appeared to be motivated by spite and ill will. While Overly appears to be credible and, in general, honorable in his dealings, his feelings of ill will appear to have seriously clouded his judgment. The Court has, in most cases, given credit to Overly's purely factual testimony, however, his conclusions as to Guthrie's actions and intentions are rejected.

### B. CONCLUSIONS OF LAW

Overly seeks a determination from this Court that the indebtedness owed him by the Debtors' is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).[2] This Court has jurisdiction to hear this claim pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

---

**1.** It appears that ACSI held joint meetings of Shareholders and Directors without distinguishing which body was acting on any given item of business. This informality is not fatal to the existence of ACSI as a corporation.

**2.** Overly also cited Sections 523(a)(1) and (4) in his complaint. As Section 523(a)(1) involves the dischargeability of tax liabilities, it

is inapposite here. Section 523(a)(4) provides an exception to discharge for fraud or defalcation while acting in a fiduciary capacity. Overly submitted no evidence or argument in support of such a claim. To the extent that Overly has attempted to make claims under Sections 523(a)(1) and (4), they are DISMISSED.

Section 523(a)(2)(A), of Title 11 of the United States Code provides, in part, as follows:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt-

\* \* \*

(2) for money, property, services ... to the extent obtained, by-

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting a debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

■ To prevail on a fraud claim, the plaintiff must prove, with a preponderance of the evidence, the following elements:

(1) The debtor made a false representation of a past or current material fact;

(2) With the intent to deceive the creditor;

(3) The creditor justifiably relied upon the representation;

(4) The creditor sustained loss as a proximate result of the representation.

*AT & T Universal Card Services v. Mercer,* 211 F.3d 214, 216 (5th Cir.2000); *St. Laurent v. Ambrose (In re St. Laurent),* 991 F.2d 672, 676 (11th Cir.1993); *AT & T Universal Card Services Corp. v. Reynolds (In re Reynolds),* 221 B.R. 828, 833–34 (Bankr.N.D.Ala.1998); *Checkcare Systems v. Alexander (In re Alexander),* 212 B.R. 993, 996 (Bankr.M.D.Ala.1997); *See also Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)(holding that "justifiable reliance" was the appropriate stan-

dard rather than the more stringent "reasonable reliance" standard); *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)(preponderance of the evidence is the proper standard for proceedings under Section 523).

■ Applying the law to the facts of this case, Overly's claim fails because he has failed to establish all four elements of a claim for fraud. First, he has failed to prove that Guthrie's representation, as to the fact that Overly was a vice president, was false. Second, as no false statement was made, Overly necessarily fails to establish the remaining elements of his Section 523(a)(2)(A) claim. As a result, the Plaintiff's claim under 11 U.S.C. § 523(a)(2)(A) should be dismissed.

## II. THE SECTION 727(a) CLAIM

■ Overly brings a separate claim pursuant to Section 727(a) of the Bankruptcy Code, requesting that the Guthries be denied their discharge. Before reaching the merits of Overly's Section 727(a) claim, the Court will note that his complaint is problematic in that he alleges that his objection to discharge is based upon sections 727(a)(2), (3), (4), (5), (6) and (7). While a creditor may base a claim on as many independent legal theories that apply, he must have a good faith basis in fact and in law for each theory raised in the pleadings. Rule 9011, Fed. R. Bankr. P.[3] The gist of Overly's case at trial was that Guthrie made several errors in his schedules and statements filed in this bankruptcy case. As these allegations most closely fit the provisions of 11 U.S.C. § 727(a)(4)(A), the Court will apply that section here. As the

---

**3.** The Plaintiff should be advised that a "shotgun" pleading is not favored. *See Morro v. City of Birmingham,* 117 F.3d 508, 515 (11th Cir.1997). A plaintiff may plead each subsection that applies, however, he should have a good faith basis in fact and in law for each claim. Rule 9011, Fed. R. Bankr. P. Plain-

tiffs who plead a long laundry list of code sections and subsections for tactical reasons, such as to unnecessarily burden their opponent or in an effort to overcome a dispositive motion, may find themselves paying sanctions.

Plaintiff failed to produce any evidence which would support a claim under Section 727(a)(2), (3), (5), (6) or (7), the Court will dismiss these claims without further consideration.

### A. FINDINGS OF FACT

Overly cites several errors, omissions and discrepancies in the various papers filed by the Debtors with this Court, in support of his Section 727(a)(4)(A) claim. The Court will examine these discrepancies and consider whether Overly has proved the necessary elements of a Section 727(a)(4)(A) claim.

### 1. The pasture land

The Debtors have listed on Schedule A, a 25% interest in 80 acres of pastureland in Izard County, Arkansas which they value at $10,000. (Doc. 8–Schedule A, amended Doc. 11–main case).[4] Overly offered into evidence a record from the Sheriff/Tax Collector for Izard County which indicates that the Debtors own an interest in 3 parcels consisting of 44.96, 38.97 and 6.00 acres respectively, for a total of 89.93 acres. Overly contends that the discrepancy between the 80 acres listed on Schedule A and 89.93 on the Tax Collector's records is sufficient, either by itself or in combination with other discrepancies described below, to deny the Debtors their discharge. Another discrepancy noted was that the Guthries actually own 50% and not 25% as indicated. David Guthrie owns a 25% interest and Liane Guthrie owns another 25% interest, for a total of 50%. Furthermore, at the Section 341

meeting, Guthrie testified that it was his opinion that the 50% interest in the property was worth $12,000 and not $10,000 as indicated in the Schedules. Overly did not offer any independent evidence as to the value of the Guthries' interest in the property. This discrepancy, by itself, is not significant.

The evidence revealed another problem with the pasture land in addition to the discrepancies as to its value or the percentage owned by the Debtors. Prior to the time the Debtors purchased their residence in Arkansas, which was in June of 1999 (approximately one month prior to the date of the petition), they mortgaged the pasture land to secure the indebtedness on the new residence. By mortgaging the pasture land, the Debtors transferred an interest in real estate which should have been disclosed in their answer to Question No. 10 of the Statement of Financial Affairs.[5] The Debtors' failure to make this disclosure is a material omission.

The minute sheet from the meeting of creditors indicates that the case was considered a possible asset case due to equity in the Arkansas property. (Doc. 9–main case). The Debtor's Schedules were confusing in that the residence was first disclosed as being owned free and clear and the pasture land was reported to be subject to a mortgage. The Schedules were later amended to reflect that both the pasture land and the residence were mortgaged and sufficiently encumbered so as to discourage the Trustee from pursuing the

---

**4.** All references to Document Numbers are to documents in the Adversary Proceeding case file except where a Document Number contains the suffix "-main case." All document references containing that suffix are to documents contained in the file for bankruptcy Case No. 99–3414, rather than Adversary Proceeding No. 99–165.

**5.** Question No. 10 requests that the Debtors "list all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **one year** immediately preceding the commencement of this case." (emphasis in original).

property. In general, the Trustee will not pursue property unless she believes that its sale will generate sufficient proceeds to pay any mortgages, taxes and other encumbrances, and the Debtors' exemption and administrative costs of the sale, such as real estate commissions, closing costs, attorney's fees and the like. The Trustee satisfied herself that it was not worthwhile to proceed against the Arkansas real estate and the case was closed as a "no asset" case. No distribution was made to the creditors. (Doc. 12–main). Neither the Court's file nor the evidence at trial indicate that Guthrie took any action to hide any assets or that he was uncooperative in any way. The Trustee did not join Overly's Section 727(a) claim, nor did she give any testimony to the effect that Guthrie was in any way uncooperative, dishonest or evasive.

### 2. The Rolex watch

Overly introduced evidence that Guthrie purchased a Rolex watch for $4,968 on August 26, 1998 and sold it for $3,150 on March 23, 1999. (Plaintiff's Exhibits M and T). Overly contends that Guthrie's failure to schedule the Rolex watch on Schedule B is tantamount to fraud. However, as this bankruptcy case was not filed until July 12, 1999 (four months after the sale of the watch), Guthrie did not own the Rolex at the time he filed his petition in bankruptcy and therefore had no duty to list it in Schedule B.[6] There was no evidence that either the purchase or the sale

of the Rolex was not at arms length and there is no evidence that either the purchase or the sale was to or from a related party. Overly did not offer any evidence that the amounts for which the Rolex was purchased or sold was not for fair value. However, as it was a transfer of property within one year of the date of the petition, the transfer should have been disclosed.[7] This failure to disclose is a material omission. The Overly failed to establish that the transfer of the Rolex watch was in any way fraudulent. The sale was to an unrelated purchaser for fair value. Moreover, there was no evidence that the proceeds from the sale were secreted or improperly placed beyond the reach of creditors. Guthrie's testimony that the money was needed to pay bills was not refuted.

### 3. Guthrie's income

In response to Question No. 1 in the Statement of Financial Affairs, Guthrie disclosed that he had income from ACSI, for the year 1998 in the amount of $30,000 and for 1999 in the amount of $16,500. (Doc. 8–main case, Statement of Financial Affairs). Guthrie did not disclose any income for the year 1997, notwithstanding the fact that he had a substantial amount of income from his employment as a Lt. Commander in the United States Navy. In addition, Guthrie owned vehicles which he leased to ACSI. This lease income should have been disclosed in response to either Question No. 1 or Question No. 2 in the Statement of Financial Affairs.[8]

---

6. Property of the estate is determined as of the date of the petition. 11 U.S.C. § 541(a).

7. Transfers of property, not in the ordinary course of business, made within one year of the date of the petition should be disclosed in response to Question No. 10 of the Statement of Financial Affairs. See, footnote 5 above.

8. Question No. 1 asks that the debtor "state the gross amount of income the debtor has

received from employment, trade, or profession, or from the operation of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year... If a joint petition is filed, state income for each spouse separately."

Question No. 2 asks that the debtor "state the amount of income received by the debtor

Moreover, Liane Guthrie's income was not disclosed. The Debtors are under a duty to truthfully and accurately disclose their income. The failure to do so in this case is a material omission.

There are a number of reasons why a debtor might be tempted to not truthfully disclose all of his income. First, the Trustee might object, pursuant to 11 U.S.C. § 707(b), for substantial abuse of the provisions of the Bankruptcy Code. Second, the truthful disclosure of the sources and amount of income may be inconsistent with representations made by the debtor to his creditors prior to filing bankruptcy for the purposes of obtaining a forbearance or other relief. In such a case, a truthful disclosure might provide evidence which would support a claim of fraud pursuant to 11 U.S.C. § 523(a)(2). Third, the truthful disclosure might provide creditors with leads to pursue undisclosed assets or fraudulent transfers. Fourth, the truthful disclosure of income might undermine a debtor's defense to another claim, for example, in a case under 11 U.S.C. § 727(a)(5), the failure to explain the loss of assets. The evidence here does not support an inference that any of these possible motivations may have provided a reason for Guthrie to willfully misrepresent these facts. More importantly, Overly does not advance any plausible reason as to how Guthrie may have benefitted from these misrepresentations. Overly's sole contention is that these misrepresentations, by themselves, support a finding of fraudulent intent and should result in the denial of a discharge in bankruptcy. The Court finds to the contrary, that Guthrie did not have any fraudulent intent.

### 4. *The vehicles*

Guthrie listed two vehicles on Schedule B of the Debtors' Schedules. (Doc. 8). Guthrie scheduled a 1999 GMC K2500 Crew Cab with a value of –0– and a 1993 Oldsmobile Cutlass Supreme, with a value of $4,000. The language at the head of the column on value states "current market value of debtor's interest in property without deducting any secured claim or exemption." Referring to Schedule D, the Court notes that Muna Federal Credit Union is scheduled as the holder of a claim in the amount of $32,000, secured by the GMC. The vehicle is scheduled with a value of $31,000 in Schedule D, but zero in Schedule B. It is therefore apparent that the Debtor incorrectly scheduled the net value, or equity, rather than the market value without deduction for the security interest. While the Debtor is in error, there is no evidence that the error was made in furtherance of a scheme to defraud.

■ The second vehicle is a 1993 Oldsmobile Cutlass Supreme which Guthrie values at $4,000. Overly offered into evidence a Kelly Blue Book analysis which he had downloaded from the internet which indicates a retail value of $9,520.[9] (Plaintiff's Exhibit L). Overly did not inspect the vehicle or offer any other evidence of value. Guthrie disputed the Kelly Blue Book value arguing that the analysis failed to take into account excess mileage and damage to the vehicle. Indeed, the valuation assumes that the vehicle is fully reconditioned and in excellent condition. A discrepancy between the amount scheduled

---

other than from employment, trade, profession, or operation of the debtor's business during the **two years** immediately preceding the commencement of this case. Give the particulars."

**9.** The Court will not address the question of whether a "retail" rather than "trade-in" value is more appropriate in this context. Even if the higher retain value is used, the Court nevertheless finds that there is no fraudulent misrepresentation here.

for a vehicle and a "blue book" or a Kelly Blue Book value may be a material fact but is not necessarily sufficient, by itself, to establish fraudulent intent. The Court finds that the Debtors did not misrepresent the value of their 1993 Oldsmobile.

### 5. Guthrie's intent

Overly's Section 727(a)(4)(A) claim turns on the debtor's intent. The Court has found that material misstatements of fact were made on the Schedules and the Statement of Financial Affairs. In making its finding of fact, that Guthrie did not have any fraudulent intent, the Court considered the following facts. First, in observing Guthrie's demeanor and listening to his testimony, the Court finds him to be forthright and credible. Second, while some of the errors in his filings were material, the evidence did not reveal any pattern or scheme to defraud. The misstatements do not appear to have been calculated to obscure a scheme to convey or conceal assets or to cover up any other wrongdoing. Guthrie appears to have been forthright and above board in his dealings with Overly.

### B. CONCLUSIONS OF LAW

The question here is whether the Debtors should be denied a discharge pursuant to 11 U.S.C. § 727(a)(4)(A). The Court has jurisdiction to hear this claim pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

Section 727(a)(4)(A) states, in part that: (A) The court shall grant the debtor a discharge, unless –

\* \* \*

(4) the debtor knowingly and fraudulently, in or in connection with the case –

    (A) made a false oath or account;

The false oath or account must be shown to be both fraudulent and material. *Swicegood v. Ginn*, 924 F.2d 230 (11th Cir.1991); *see also Sholdra v. Chilmark Financial, L.L.P. (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir.2001)(The Objecting party must prove: (1) that the debtor made a false statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy)(citing *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir.1992)); *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir.1997)(Nondisclosure of an asset does not result in denial of discharge where there is no evidence of fraud). In order to be fraudulent, the false oath must have been made by the debtor with a "knowing intent to defraud creditors." *Parnes v. Parnes (In re Parnes)*, 200 B.R. 710 (Bankr.N.D.Ga.1996)(citing *Swicegood*, 924 F.2d at 232); *see also Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 306 (11th Cir.1994); *Wines v. Wines (In re Wines)*, 997 F.2d 852, 856 (11th Cir.1993). "The Plaintiff must demonstrate actual, not constructive fraud, (citation omitted) but since defendants will rarely admit their fraudulent intent, actual intent may be inferred from circumstantial evidence." *Id.* (citing *Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 123 (M.D.Fla. 1991); *Butler v. Ingle (In re Ingle)*, 70 B.R. 979, 983 (Bankr.E.D.N.C.1987)). The party opposing discharge bears the burden of proof Rule 4005, Fed. R. Bankr. P.

The Court heard the testimony and observed the demeanor of Guthrie, his wife Liane and Plaintiff James Overly. While there were several material misstatements or omissions in the Statement of Financial Affairs and the Schedules on file in this case, the Court finds that the misstatements were not "knowingly and fraudulently" made. First, the Debtors did not

omit any assets. While a misdescription of an asset can, under some circumstances be fraudulent, the Court finds that one intending fraud is more likely to omit an asset rather than misdescribe it. At the time the Trustee concluded the Section 341 meeting, the case was noted to be an "asset" case. (Doc. 9–main case). The Trustee investigated the transactions relating to the purchase of the Arkansas residence and the error in the description of the pasture land and concluded that this case should be closed as a "no asset" case. (Doc. 12–main case).[10]

With respect to the misstatements of the Debtors' income, the Court further concludes that no fraud was intended. The minutes of the Section 341 meeting indicate that Overly's attorney was present. While Overly may not have been aware of the other misrepresentations at the time of the Section 341 meeting, he certainly knew of the discrepancies regarding Guthrie's income at all times relevant to this case, yet there is no record that Guthrie made the Trustee aware of the discrepancy, or that he took any action other than filing this Adversary Proceeding. Having shown that Guthrie misstated his income on his Statement of Financial Affairs, Overly was unable to articulate any harm which may have resulted to him or the estate as a result of the misstatement. There was no evidence that any of this income, in excess of that which was disclosed, was diverted or secreted or that Guthrie dissipated assets through a lavish life-style or that he placed assets beyond the reach of creditors. The only conclusion which can be drawn from the evidence submitted at trial was that Guthrie used his income to support himself and his family or pay creditors.

It should be born in mind that denial of the Debtors' discharge is a harsh remedy. As a general rule, in making a determination whether a discharge should be denied, the statute should be construed strictly against the party objecting to discharge. *See Hunerwadel v. Dulock (In re Dulock)*, 250 B.R. 147, 153 (Bankr.N.D.Ga. 2000) (citations omitted)(as a discharge facilitates a debtor's "fresh start," one of the primary purposes of bankruptcy law, the discharge provisions must be construed liberally in favor of the debtor and strictly against the objecting creditor). "The purpose of the false oath exception is not to punish debtors for mere inadvertence, but, rather to insure that adequate information is available to the trustee and all interested parties." *Behrman Chiropractic Clinics, Inc. v. Johnson (In re Johnson)*, 189 B.R. 985, 993 (Bankr.N.D.Ala.). The Court may infer fraud from "a series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive." *In re Parnes*, 200 B.R. at 714; *see also Crews v. Stevens (In re Stevens)*, 250 B.R. 750, 755 (Bankr.M.D.Fla.2000); *Behrman Chiropractic Clinics, Inc. v. Johnson*, 189 B.R. 985, 994 (Bankr.N.D.Ala.1995). Indeed, one material misrepresentation, if accompanied by actual intent to defraud, is sufficient to result in the denial of a discharge. All filings with the Court should be complete and accurate. Debtors who make incomplete or inaccurate filings run the risk that the Court may not conclude, as it does here, that the error was innocent.

In conclusion, the Court finds that Overly has failed to prove beyond a preponderance of the evidence that Guthrie

---

10. Trustee Susan DePaola's letter of September 2, 1999, to the Bankruptcy Administrator is contained in the Court's main case file but was not docketed. As this case was closed as a "no asset" case, and as no further proceedings were taken by the Trustee, the Court infers that Guthrie cooperated with the Trustee and that she was satisfied that there was no equity in any of the property available for distribution.

knowingly made a false oath with the fraudulent intent to deceive his creditors While the Court finds that the misstatements and omissions by Guthrie were material, "a demonstration that a misstatement is material is insufficient in and of itself to deny discharge." *See Parnes,* 200 B.R. at 714. "The misstatement or omission must be made with the requisite fraudulent intent..." *Id.* (citing *In re Bailey,* 147 B.R. 157, 164 (Bankr.N.D.Ill. 1992); *In re Ayala,* 107 B.R. 271, 275 (Bankr.E.D.Cal.1989)). As the Court finds no fraudulent intent on the part of Guthrie, Overly's claim under 11 U.S.C. § 727(a)(4)(A) must fail, and should be dismissed. A separate judgment consistent with this memorandum decision will be entered by the Court.