**In re Bonita B. PHILLIPS and Jeffrey Scott Phillips, Debtors.**

**EPIC Aviation, LLC, Plaintiff,**

v.

**Jeffrey Scott Phillips, Defendant.**

**Bankruptcy Nos. 9:06–bk–05686–ALP, 9:06–bk–07489–ALP.**

**Adversary No. 9:07–ap–00181–ALP.**

United States Bankruptcy Court, M.D. Florida, Fort Myers Division.

Aug. 10, 2009.

Edward R. Miller, Miller and Hollander, Naples, FL, for Debtors.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALEXANDER L. PASKAY, Bankruptcy Judge.

The central purpose of the bankruptcy laws in the United States, as described by the Supreme Court, is "to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). However, this opportunity for a "fresh start" is limited to the "honest but unfortunate debtor." *Id.* at 287, 111 S.Ct. at 659. The "fresh start" of bankruptcy is embodied in the concept of discharge, whereby, in a bankruptcy case, an insolvent individual may be discharged of certain unpaid debts and obligations. *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367, 127 S.Ct. 1105, 1107, 166 L.Ed.2d 956 (2007). In a Chapter 7 bankruptcy case, a discharge is given following the liquidation of the debtor's non-exempt assets by the trustee for distribution to creditors. *Id.*

A discharge may be withheld in certain circumstances. 11 U.S.C. § 727(a). Many of the causes for withholding a discharge, *see* § 727, are much older than the Bankruptcy Code. The requirement that debtors give a full disclosure of their financial affairs in order to receive a discharge can be traced back in U.S. law to the first bankruptcy act, the short-lived Bankruptcy

Act of 1800. Citing the 1800 Act, the Supreme Court stated in 1828 that a debtor shall be subject to various penalties, including being "deprived of a right to a certificate of discharge," where failing,

> [To] fully and truly disclose and discover all his or her effects and estate, real and personal, and how and in what manner, and to whom and upon what consideration, and at what time or times, he or she hath disposed of, assigned, or transferred, any of his or her goods, wares, or merchandise, moneys, or other effects and estate....

*Comegys v. Vasse*, 26 U.S. 193, 219, 1 Pet. 193, 219, 7 L.Ed. 108 (1828) (citing Bankruptcy Act of 1800, § 18 (repealed 1803)). The requirement of full disclosure remains fundamental to the structure of Chapter 7. Under § 727(a) of the Bankruptcy Code, cause for denial of a discharge now includes the following:

> (2) the debtor, with intent to hinder, delay, or defraud ... *transferred,* removed, destroyed, mutilated, or concealed ...—
>
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> >
> > (B) property of the estate, after the date of the filing of the petition;
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve *any recorded information ... from which the debtor's financial condition or business transactions might be ascertained,* unless such act or failure to act was justified under all of the circumstances of the case;
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>
> > (A) made a *false oath* or account;
> >
> > ...

> (5) the debtor has *failed to explain satisfactorily* ... any loss of assets or deficiency of assets to meet the debtor's liabilities;
>
> ...
>
> (7) the debtor has committed any act specified [above] on or within one year before the date of the filing of the petition, or during the case, in connection with another case ... concerning an *insider* ....

11 U.S.C. § 727(a)(2), (3), (4)(A), (5) & (7). In this proceeding, the Plaintiff has alleged that the Debtor has done, in fact, all of the above, and therefore is ineligible to receive a discharge in this bankruptcy case—that he is not an "honest debtor." The Court must determine what, among all the facts presented at trial that have been established by a preponderance of the evidence, *see Grogan v. Garner,* 498 U.S. at 291, 111 S.Ct. at 661, constitutes cause to deny a discharge under § 727.

This proceeding came to this Court in the following way. Jeffrey Scott Phillips ("Debtor" or "Phillips") is an airplane pilot, certified to fly a variety of jet airplanes, and holds a four-year college degree. He worked as a pilot for Delta Airlines for several years before starting his own airplane charter business in 1983. Since then, the Debtor has been the principal of or partner in several charter businesses, and has owned and invested in several multimillion-dollar jet airplanes. (Trial Tr. 44:17–47:11.) Phillips was the principal of Jet 1 Center, Inc. ("Center"). While Phillips was the principal of Center, it leased an approximately 40,000 square foot facility worth $2 to $3 million and employed between 20 and 40 people. Center provided private jet services to a high level clientele. (Trial Tr. 47:12–49:12.) It is fair to characterize the Debtor as a sophisticated, educated businessperson.

Center filed for relief under Chapter 11 on December 29, 2003, remaining a debtor in possession until the case was converted to Chapter 7 on March 13, 2006. (*See* Case No. 9:03–26514.) For purposes of § 727(a)(7), it is not disputed that Center is an insider of the Debtor. Phillips filed his own petition under Chapter 7 on December 29, 2006. With the petition, the Debtor filed his schedules and statements. Since the filing, the Debtor has filed two single-page amendments. He amended the Statement of Financial Affairs ("SOFA") once to include a single additional closed bank account and Schedule F once to include a single additional creditor. Neither amendment is relevant here, so for purposes of this Opinion, all references to the Debtor's schedules and statements refer to the original filing (*see* Doc. No. 1, Case No. 9:06–bk–7489–ALP). The Plaintiff, EPIC Aviation, LLC ("EPIC"), is a creditor of both Center and the Debtor. EPIC filed a proof of claim in the Phillips case for $528,018, based on a 2004 Oregon judgment. (*See* Claim No. 11.) While not relevant to the matter at hand, it was clear, from the evidence presented at trial, that EPIC and the Debtor have a long-standing, acrimonious relationship.

EPIC has pleaded five counts in the Complaint objecting to discharge. The Plaintiff seeks to prove that, in his own case, the Debtor made false oaths, *see* § 727(a)(4)(A), made fraudulent transfers in the year prior to filing, *see* § 727(a)(2)(A), failed to satisfactorily explain the loss or diminution of estate assets, *see* § 727(a)(5), and failed to maintain adequate business records, *see* § 727(a)(3). The Plaintiff has also pled that the Debtor committed similar acts in connection with the Center case, *see* § 727(a)(7): that the Debtor transferred, removed, destroyed, mutilated, or concealed property of the estate, *see* § 727(a)(2); concealed, destroyed, mutilated, falsified, or failed to keep and preserve books and records, *see* § 727(a)(3); made false oaths or withheld information relating to the Debtor's property or financial affairs, *see* § 727(a)(4); and failed to satisfactorily explain loss or deficiency of assets sufficient to meet liabilities, *see* § 727(a)(5).

## I. FINDINGS OF FACT

At trial, EPIC produced evidence and elicited testimony regarding a variety of incidents that took place in connection with the Debtor's bankruptcy case and with the Center case. At times, EPIC strayed from the facts specifically pleaded in the Complaint, which the Court allowed so that all relevant facts might be considered to generally paint the picture of the Debtor's acts in connection with these bankruptcies.[1] The Court will make its findings incident by incident, although each incident may relate to more than one count in the Complaint.

## A. Transfers To and From the Debtor's Corporations

The Debtor was the principal of numerous corporate entities. These corporate entities, while maintaining separate books, transferred funds between entities using a rather curious accounting method. In the ordinary course of business, when funds were transferred from one entity to another, they would pass through the Debtor's personal account. Certain corporate expenses were also charged to Mr. Phillip's personal account. Such transfers occurred within the year prior to filing. However, it is not clear which, if any, of these transfers involved the transfer of funds from the Debtor individually to any of the insider

---

1. The Court specifically denied the Plaintiff's *ore tenus* motions on the morning of the trial, several times during trial, and at the end of trial, to amend the Complaint.

corporate entities, and which transfers were, in essence, transfers between corporate entities. (Trial Tr. 117:14–139:6.) There were also numerous transfers *to* the Debtor from the corporate accounts. No calculations were presented to the Court that explained the net result of these transfers—whether money was generally flowing to the Debtor or from the Debtor, or whether all these transfers were in effect transfers between corporations. The Debtor's interest in the various corporate entities was disclosed in his schedules, but no reference regarding these transfers, however vague, was made in the schedules or statements.

The Plaintiff failed to show that these transfers involved the transfer of assets from the Debtor to other entities, or that these transfers were no more than a novel, but improper, bookkeeping method. As it is not the role of the Court to undertake forensic accounting, but to review the evidence presented by the parties, the Court cannot conclude that it has been established by a preponderance of the evidence that the Debtor transferred funds within a year of filing to an insider corporation. However, it is clear that these transfers, whether a bookkeeping method or actual transfers, were not properly disclosed.

### B. Real Estate Transaction with Christopher Cioffi

The transaction between Phillips and Christopher M. Cioffi ("Cioffi") can be summarized as follows. Phillips and Cioffi were members of the same country clubs and played golf together. They entered into a real estate investment arrangement that was entirely informal in nature—a "handshake" deal. Phillips knew that Cioffi and other individuals were regularly involved in real estate investments and that several had been quite successful. Phillips asked Cioffi whether there were

any deals he could invest in, and Cioffi offered him the opportunity to put $100,000 into a down payment on a real estate investment in Englewood. Phillips did so in August 2005 on a handshake. (Testimony of Phillips, Trial Tr. 103:19–106:23; Pl.'s Ex. 7.) The transaction was never documented, and Phillips's interest was never recognized on any of the papers documenting the purchase of the real property, or in the papers creating the L.L.C. that was created to hold the real estate. (Testimony of Christopher M. Cioffi, Trial Tr. 267:8–272:18.)

As the real estate market began to soften and his own financial situation began to decline, Phillips approached Cioffi and asked to be bought out of the deal. Cioffi agreed to buy him out for $50,000, and wrote him a check for that amount dated August 14, 2006. (Pl.'s Ex. 5.) This transaction was not disclosed anywhere on the Debtor's schedules or statements. Specifically, it was not listed in the Debtor's SOFA as a transfer outside the ordinary course of business. The Debtor has argued that this failure to disclose is not a willful omission for two reasons. First, he testified that the transaction was disclosed to the Trustee. (Trial Tr. 147:19–25, 300:24–301:2.) Secondly, the Debtor's bankruptcy counsel, Richard Hollander ("Hollander"), indicated that he did not believe that there was an appropriate place on the schedules and statements to disclose this particular transaction. (Trial Tr. 256:3–18).

### C. Transfer into the IRA

On February 13, 2006, the Debtor took $55,000 from his home equity line of credit and deposited that amount into his IRA. (Pl.'s Ex. 15; Trial Tr. 224:22–225:10.) When the Debtor withdrew the $55,000 from the home equity line, he placed the funds temporarily in a checking account,

from which he then wrote a check to his IRA. (Trial Tr. 301:14–302:22.) The Debtor testified that he took the funds from his home equity line and put them into his IRA in order to invest in an initial public offering of stock, not in response to any creditor action being taken against him. (Trial Tr. 398:9–399:10.) The Debtor believed that he was simply moving funds from one exempt asset to another. (*Id.*) This transfer did not convert non-exempt assets to exempt assets. If anything, it converted exempt assets to non-exempt, because the transfer resulted in the over-funding of the Debtor's IRA. However, this transfer was not disclosed anywhere on the Debtor's schedules or statements.

### D. Entertainment Expenses

The Debtor listed $0 in entertainment expenses on his Schedule J. It is not contested, nor could it be, that the Debtor spent money on entertainment expenses in the year prior to filing (*e.g.*, Testimony of Jeffrey Phillips, Trial Tr. 176:14–177:10; 178:22–179:24). The Debtor's attorney testified that normally he does not list any amount for entertainment expenses in a Chapter 7 case, and that it did not matter in this case because the net income was already a negative number. (Testimony of Richard Hollander, Trial Tr. 346:13–347:12.) Furthermore, many of the Debtor's entertainment expenses were being paid for by the Debtor's businesses, and Hollander also testified that he would not include them for that reason. (Trial Tr. 347:15–25.) The Court disagrees with Hollander's conclusion that entertainment expenses need not be disclosed on Schedule J where the Debtor's disposable income is already a negative number. It is clear that the Debtor had significant entertainment expenses that were not listed in Schedule J among his other monthly expenses.

### E. 2006 K–1 Income

According to the Debtor's tax returns, he received $631,729 in K–1 income in 2006, the year of filing. The tax returns were not prepared until many months after the petition date. The Debtor's SOFA does not list any K–1 income for 2006 under either Question 1 or Question 2, and the SOFA was never amended to include this income. In defense, the Debtor elicited the testimony of the attorney who represented him in the preparation and filing of his schedules and statements. Hollander testified that, in his opinion, if the Debtor had received any K–1 income in the year prior to filing, it would not have been listed under Question 1 of the SOFA, because it was not income from employment, trade or profession. (Trial Tr. 374:2–9.) Concluding that K–1 income is the *type* of income listed under Question 2, Mr. Hollander further testified that under his interpretation of the language of Question 2, only such income received in the two years prior to the year of filing should be listed—for example, since the filing occurred in 2006, Question 2 requires listing only income received in 2004 and 2005, which was listed. Mr. Hollander further asserted that while no K–1 income for 2006 was listed under Question 2, the underlying tax returns were provided to the Trustee once they had been prepared. (Trial Tr. 374:11–375:10.) The Court completely disagrees with Mr. Hollander's interpretation of Question 2. Any K–1 income earned in 2006, the year of filing, should also be disclosed. However, in this case, the 2006 tax return was not prepared until October 25, 2007. (Pl.'s Ex. 56.) On the date of the petition, information regarding the amount of K–1 income in 2006 was not available.

### F. Payments to Attorneys

Several payments were made by Phillips to attorneys in the year prior to the filing

of his petition. Phillips paid $5,000 to the law firm of Grimes Goebel to represent him in an appeal, $10,000 to the attorney Mark Hildreth to represent him in litigation related to the Center case, $5,000 to the law firm of Allen, Kuehnle & Stovall to represent him in a case regarding a deficiency on an airplane, $3,500 to the attorney Brian Zinn to represent him in an adversary proceeding related to the Center case, and an unestablished amount to Len Thornton to represent him in another adversary proceeding related to the Center case. (Trial Tr. 151:22–154:6.)

The Plaintiff has argued that these payments should have been disclosed under Question 9 of the Debtor's SOFA. Question 9 instructs debtors to list all payments made, including payments to attorneys, "for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy" within a year of filing. The Debtor testified that none of these attorneys advised or represented him in the preparation of his own petition for bankruptcy relief or advised him on debt consolidation. (Trial Tr. 397:25–398:8.) While several of the attorneys are bankruptcy lawyers, the Debtor testified that their representation of him only related to litigation involving the Debtor in the Center case and various other forums. Based on this testimony, which was credible, the Court finds that none of these payments to attorneys were for advice or representation related to the Debtor's own bankruptcy filing or his personal debt issues, such as should be disclosed under Question 9.

Question 10 of the SOFA relates to transfers made within two years of filing outside the ordinary course of business. Under Question 10, a single payment to attorneys, Grant, Fridkin, Pearson, Athan & Crown, P.A., in the amount of $43,763.07, is disclosed. None of the payments to attorneys described above are listed under Question 10. In fact, these payments do not appear anywhere in the Debtor's schedules or statements.

## G. Deposit and Commercial Lease

At some point, Midtowne Partners and Jet 1 Charter, Inc. ("Charter"), one of the Debtor's companies, negotiated a commercial lease. Although the lease was for the benefit of Charter, and lease payments were made by that entity, Midtowne Partners wanted to have the lease put in the Debtor's name individually. (Trial Tr. 393:11–394:10.) The security deposit and first month's rent, in the amount of $3,090.00, were paid for by the Debtor. (Pl.'s Ex. 110 at 8.) The Debtor testified that he was reimbursed for that payment by Charter. (Trial Tr. 409:1–411:11.) The Debtor's interest in the commercial lease and security deposit was not disclosed in the Debtor's schedules or statements.

## H. Alleged Gambling Losses

Question 8 of the SOFA requires debtors to disclose any losses from gambling in the year prior to filing. The Plaintiff has argued that the Debtor failed to disclose substantial gambling losses incurred within a year of filing. As alleged proof of such losses, the Plaintiff presented evidence regarding the following transactions. First, the Debtor made a payment of $1,689.76 to Jim Malone for his share of the cost of a golf tournament. The bill was sent to the Debtor following the tournament. (Trial Tr. 145:15–147:1.) The receipt for this payment was not introduced into evidence, and the Debtor did not testify as to the date of the payment. The payment was not listed on the Debtor's schedules and statements, and the Debtor has argued that it was nothing but an ordinary course of business expense.

Second, the Debtor wrote a check to Fran Lord ("Lord") for $2,400, which was debited from the Debtor's checking account on March 9, 2006, and in the memo line of that check, the phrase "golf equipment" was written. (Pl.'s Ex. 19, p. 13.) At trial, Phillips indicated that he could not remember what that payment was for, but that it was not a payment for the purchase of golf equipment or for the payment of a gambling debt. He thought that, to the best of his recollection, Lord had loaned him cash so that he would not have to go to the bank one afternoon, and therefore would be able to continue to play golf. Before going on flights, Phillips testified, he always made sure to have several thousand dollars in cash with him. The phrase "golf equipment" was a joke, because they played golf together. (Trial Tr. 170:21–172:22.) The payment was not listed anywhere on the Debtor's schedules and statements. The Court cannot conclude, by a preponderance, that either of these two payments were for gambling debts.

The Plaintiff also inquired as to the Debtor's past gambling habits and current gambling activities. The Debtor testified that he had no losses from gambling in the year prior to filing. The Debtor admitted that he had at one time played a golf gambling game called "Wolf" for high stakes, but that he did not play for high stakes during the year prior to filing. Specifically, the Debtor stated "Not at all. I do not play those big games at all. I play a $10 game, period." (Trial Tr. 167:7–169:2.) Cioffi also testified as to the Debtor's gambling habits, testifying that he had played high-stakes games of Wolf with the Debtor in the past, but prior to 2006. He testified that they played for high stakes, $1,000 games, only at a club they belonged to between 2000 and 2004, called Premier or Naples Grande. After they left that club, he testified, they only played for small stakes, between $5 and $20 per game (Trial Tr. 273:20–277:15.)

There is sufficient evidence to raise the Court's suspicion, and it is clear that the Debtor gambled small amounts in the year prior to filing, by his own admission. However, based on the evidence before the Court, the Plaintiff has not met the burden of establishing by a preponderance of the evidence that the Debtor incurred gambling losses in the year prior to filing.

### I. Sea Ray Boat

At some point prior to the petition date, the Debtor owned a Sea Ray power boat. The Debtor testified that he could not recall the exact date that the boat was sold, but that the boat was up for sale for a long time and eventually was sold at a loss. (Trial Tr. 403:2–12.) He testified that, to the best of his recollection, the boat was sold sometime in 2005, but that due to title problems, it took several months for title to be changed over to the new buyer. Payoff of the Bank of America loan on the boat occurred on March 14, 2006—in the amount of $5,945.34. (Pl.'s Ex. 110 at 8.) Although the payoff of the lien on the boat was done within one year of filing, it is not clear from the evidence exactly when the sale took place. No evidence was presented as to the sale price of the Sea Ray, and the fact that the Debtor sold the boat at a loss was uncontroverted. The sale of the Sea Ray was not disclosed anywhere in the Debtor's schedules or statements.

The Complaint nowhere mentions the Sea Ray boat or the failure to disclose the sale of the Sea Ray boat. The Debtor's counsel objected to all testimony relating to the boat on this basis. The Court allowed the testimony, but denied the Plaintiff's *ore tenus* motion to amend the Complaint at trial. Based on this record, the Court cannot make a finding that a sale or

transfer of the Sea Ray occurred within two years of filing.

### J. Valuation of 650–0002, Inc.

One of the incorporated entities in which the Debtor had an interest was 650–0002, Inc. ("650"). The principal asset of 650 is an airplane. (Testimony of Mr. Phillips, Trial Tr. 144:16–145:12; *see also* Testimony of Diane Jenson, Trial Tr. 287:1–6.) The Debtor listed on his schedules a 50% interest in 650. As with the Debtor's interests in other corporate entities, the value of the Debtor's interest in 650 is listed as "unknown." During the case, the Trustee and the Debtor negotiated the sale of the estate's interest in 650 back to the Debtor for $5,000. The Plaintiff argues that the Debtor's inexact valuation of 650 in the schedules constitutes a false oath. At some point during the case, but following the date of the petition, 650 entered into a contract under which the Debtor would receive $60,000 in commission.[2]

### K. Country Club Memberships

Prior to the date of the petition, the Debtor was a member of the Hideout Golf Club. In November 2006, the Debtor converted his membership from an equity membership to a non-equity membership. By converting to non-equity, the Debtor forfeited approximately $35,000 of equity for the right to remain a member while the remainder of his equity share took its place in line to be sold to a new member. The wait list for the sale of a Hideout Golf Club membership is several years long. (Trial Tr. 97:17–101:21; 239:7–242:17.) The Debtor testified that the conversion from equity to non-equity was not done because of any creditor action, but was a

plan to raise cash. Also, he believed the membership was a tenancy by the entireties asset, owned jointly with his wife. (Trial Tr. 400:23–401:23.) The Debtor's explanation of the transaction that occurred was supported by the testimony of Elizabeth Landry, who is an employee of Hideout Golf Club (Trial Tr. 237:5–240:24), and Maurice Kent, who is managing partner of Hideout Golf Club (243:8–249:1).

In this transaction, the Debtor gave up $35,000 of equity in his country club membership in exchange for the right to continue to be a member indefinitely while still receiving the proceeds of the remaining value of his membership when his name came to the top of the list at some point in the future. While the Plaintiff may argue that this was a bad business decision, the transfer appears to be for reasonably equivalent value. Moreover, the membership was listed on the Debtor's schedules B and C as "Hideout Golf Club Memberships; tenancy by the entireties." (Pl.'s Ex. 1, at 22.) In answer to Question 10 on the Debtor's SOFA, the Hideout Golf Club is listed, with a date of November 2006 for a transfer described as "Social/non equity membership converted." (*Id.* at 48.) Thus, it is clear that the existence of this asset was sufficiently disclosed.

Prior to the petition date, Jet 1, Inc., another of the Debtor's companies, had a membership at Premier Club. (Trial Tr. 220:23–221:9.) Jet 1, Inc., through the Debtor and his wife, resigned from the Premier Club in September 2004, and when the membership is sold, Jet 1, Inc. will be entitled to $15,000. (Trial Tr. 223:3–224:17.) Neither the country club

---

**2.** The Plaintiff implied that this contract was entered into just prior to the 341 meeting, while the Debtor was in active negotiations with the Trustee regarding the sale. While the Contract was not entered into evidence and therefore cannot be the basis for consideration, the Court would parenthetically note that the 341 meeting was held on February 14, 2007, while the contract is dated January 2008.

membership nor any interest in the $15,000 were listed on the Debtor's schedules or statements. It is the Court's finding, based on the evidence, that although the benefit of the membership while active may have run to the Debtor, the interest in the $15,000 belongs to Jet 1, Inc., not to the Debtor.

## L. Purchase of and Improvements to the Homestead

In January 2005, the Debtor sold his homestead, and subsequently purchased a new home. (Trial Tr. 65:13–66:2.) Listed under Question 10 of the Debtor's SOFA, were the following items: "Purchased homestead property February 2005 ... for $4,175,000," and "The homestead property at 3060 Green Dolphin Lane in Naples was remodeled between February 2005 and July 2005." Attached to Question 10 is an elaborate list itemizing these remodeling expenses. (Pl.'s Ex. 1 at 49–53.) At trial, the Plaintiff connected some of the expenses listed in this four page attachment to items in the Debtor's bank statements, indicating that the expenses were incurred in February through July *2006*, not 2005. (Testimony of Mr. Phillips, Trial Tr. 421:6–423:7.) These expenses totaled $766,887.22. (Pl.'s Ex. 1 at 53.) The Debtor's prior homestead had a mold infestation problem, and the Debtor received $3.2 million from litigation related to the mold issue. The Debtor used that money, along with an unknown amount received as proceeds from the sale of the homestead, to invest in the Green Dolphin homestead. (Trial Tr. 65:13–66:3.)

## M. Beretta Shotgun

A shotgun, with the current value of the Debtor's interest estimated at $100, is list-ed in the Debtor's Schedule B, personal property. At trial, the Debtor testified that the shotgun had been purchased for his then–17–year–old son, as a partial gift.[3] His son had paid $500 of the purchase price, and the Debtor had paid the remainder. Because it was purchased just before the son's 18th birthday, the gun was purchased in the Debtor's name, not in the name of his son. (Trial Tr. 202:21–203:15.) The Debtor further testified that the $100 value listed on the schedules "was a pure guess" suggested by his bankruptcy attorney. (Trial Tr. 203:16–204:1.) According to the receipt produced at trial, the shotgun is a "Beretta AL391," purchased on January 31, 2006, approximately 11 months prior to the date of filing, for a purchase price of $1,095.00, plus $70.70 in taxes and fees. (Pl.'s Ex. 97(A).)

The Plaintiff elicited the testimony of an expert witness, Wayne Bergquist ("Bergquist"), the owner of the gun shop where this particular shotgun was purchased. Bergquist testified that so long as the shotgun was not damaged, he expected that its value in 2006, as a slightly-used Beretta AL391, would have been approximately $625. (Trial Tr. 230:25–231:7.) He stated that the range of values based on condition in 2006 could have been anywhere from $350 to $940. (Trial Tr. 229:25–230:17.) Bergquist also testified that he had not seen the particular shotgun in question since he sold it to the Debtor and that he could not state the actual value of the shotgun at any time without actually seeing it. (Trial Tr. 231:8–10; 223:6–10.)

The Complaint nowhere mentions the shotgun or an objection to the valuation of the shotgun. The Debtor's counsel objected to all testimony relating to the shotgun

---

**3.** Plaintiff's counsel has argued that purchasing the shotgun for his 17–year–old son just prior to his 18th birthday, as a present for that birthday, was illegal. Even if this argument is valid, which is uncertain (*see* Trial Tr. 233:19–25), it is not relevant.

on this basis. The Court allowed the testimony, but denied the Plaintiff's *ore tenus* motion to amend the Complaint. After carefully considering the evidence, the Court finds no cause to amend the pleadings. Based on the evidence, the Court finds that the shotgun could have been worth no more than $940, was probably worth much less, and that the Debtor, the title owner of the gun, acted reasonably to estimate its value at $100.

### N. Removal of Cabinet Doors from Airport Facility

During the Center Case, there came a time when the airport facilities of Center were turned over to the Naples Airport Authority. The day before the keys were handed over, the Debtor's wife and some of the employees of Center removed cabinet doors and drawer faces from cabinets throughout the facility. Some of these cabinet doors were placed in a dumpster. The Debtor testified that he was not present while this took place, but that he arrived later after the removal had happened. He also testified that he called the company that had installed some of the doors and asked whether they could use the materials. (Trial Tr. 209:5–210:25.)

The next day, when the keys to the Center facilities were handed over to the Naples Airport Authority, their representative, Theodore Soliday ("Soliday"), asked the Debtor what had happened to the cabinet doors. When asked whether he told Soliday that First National Bank had taken the cabinet doors, the Debtor responded that "maybe the bank took them." (Trial Tr. 214:5–215:15.) Some time following the return of the facilities to the airport, upon demand of the Naples Airport Authority, the Debtor returned the property and/or paid for its replacement. The Debtor testified that there was some question in his mind, at that time, as to who actually owned the property that was being removed. The Naples Airport Authority claimed that the cabinet doors were its property that was illegally removed by the Debtor. At the time of the removal, however, Center had possession of the facility. The Debtor did not have approval of the Court in the Center case to dispose of the cabinet doors. (Trial Tr. 216:13–218:17.) The testimony of Soliday generally agreed with the Debtor's story of events that day, except that he testified unequivocally that the Debtor told him that the bank took the doors, and that the doors were returned or replaced after they had a lawyer write a letter to Mr. Phillips. (Trial Tr. 257:5–258:11.) It is clear from this record that the cabinet doors were removed by or with the approval of the Debtor, at a time when Center remained in possession of the airport facilities.

The Debtor has argued that these acts cannot be the basis for an action under § 727(a), because the property in question was not the property of the bankruptcy estate of Center, but rather was the property of the Naples Airport Authority. Soliday testified that at the time the items were removed, there was no dispute, as far as he was concerned, to the fact that the cabinets were the property of the Naples Airport Authority. (Trial Tr. 259:18–262:4.) The trustee in the Center case never made a claim against the Authority for the return of the cabinet doors. (Testimony of Theodore Soliday, Trial Tr. 265:19–22.) The Debtor's destruction and concealment of these cabinet doors took place at a time when Center was in possession of the airport facilities.

### O. The Rolex Watch

The consistent testimony of the Debtor, from the § 341 meeting of creditors until the date of trial, has been as follows. The Debtor purchased a Rolex watch on April

26, 1983, the receipt for which was produced but not admitted into evidence at trial. At some point prior to the filing of this bankruptcy case, the Debtor, while on a ski trip to Deer Valley, Utah, sold the Rolex watch to an individual named Barry Smith for $1,500. The Debtor testified that he looked for records of that specific trip to Utah, but could not remember or determine on which trip to Deer Valley, Utah he had sold the watch. (*See* Trial Tr. 156:17–161:15.)

The Court notes that the Debtor's testimony did not change from the time of the § 341 meeting of creditors on February 14, 2007, until the date of trial, and, there being no evidence to the contrary, finds this story credible. The Rolex watch was nowhere referenced on the Debtor's schedules. The Debtor's explanation regarding the sale of the watch is plausible, and it is further reasonable that the Debtor would have no records documenting the transaction, under the circumstances. While debtors may be required to keep adequate records of their finances, the sale of a 20 year old watch to a friend while on vacation in exchange for cash is not the sort of financial transaction that would be expected to require documentation. Further, no evidence indicates that this transfer occurred within two years of the filing.

### P. The Overall Picture

The Debtor's attorney, Mr. Hollander, testified that he spent three months working on Mr. Phillips' schedules for his personal bankruptcy case. He also testified that even prior to the § 341 meeting, that he and the Debtor met with the Chapter 7 Trustee to open up the Debtor's books and records. (Trial Tr. 342:3–344:22; *see also* Testimony of Ms. Jensen, Trial Tr. 298:1–299:24.) As Mr. Hollander testified, the purpose of these meetings was to "[d]isclose whatever needed to be disclosed, at

her request. This was a complex case and it had a lot of documents. There were transactions that needed explanation." (Trial Tr. 344:20–22.) Nevertheless, in this case, there were several substantial assets and transfers that were not disclosed anywhere in the Debtor's schedules or statements.

### II. Conclusions of Law

This Court has jurisdiction pursuant to 28 U.S.C. § 1334(a). This is a core proceeding based on an objection to discharge pursuant to § 157(b)(2)(J).

### A. Denial of Leave to Amend

█ At the start of the trial, several times during the trial, and at the end of the trial, the Plaintiff made *ore tenus* motions for leave to amend the Complaint to add various factual allegations that might support denial of a discharge. The Court denied these motions. The Plaintiff is correct that as regards requests to amend pleadings prior to trial, "[t]he Court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a). In *Foman v. Davis*, the Supreme Court held that it was an abuse of discretion to deny a petitioner's motion to amend the complaint to state an alternative legal theory for recovery, based on the same set of facts, where the original complaint failed to present a legal theory that could be a basis for relief. 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). The Court held that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id.* The Eleventh Circuit has also held that under *Foman v. Davis*, it is an abuse of discretion to deny a request for leave to amend under Rule 15(a) "absent prejudice to the defendant, bad faith or undue delay on the part of the plaintiff." *Warner v.*

*Alexander Grant & Co.,* 828 F.2d 1528, 1531 (11th Cir.1987).

However, the question before the Court here was not whether to grant a motion for leave to amend the complaint prior to trial, but whether, at the start of, during, or after the trial, the Plaintiff should be allowed to amend the complaint to include additional factual grounds for relief. There is no evidence that the relevant facts were newly discovered: to the contrary, the Plaintiff argued that it should be allowed to amend *because* these facts have been well known by the parties for several months.

At trial, the Court decided to allow the Plaintiff to introduce evidence about matters not included in the pleadings. (Trial Tr. 202:9–20.) The Court did not rule that the pleadings would be amended, only that evidence would be admitted and considered by the Court. If the evidence had proven substantive, the Court would consider amending the pleadings to conform to the evidence. However, as explained herein, the admitted evidence that falls outside the pleadings does not present a basis for relief, and therefore, the Court will not amend the pleadings.

## B. False Oaths & Fraudulent Transfers

Count I of the Complaint is based on § 727(a)(4)(A), which provides for the denial of a discharge where a "debtor, knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account...." The Plaintiff has listed the following specifically alleged false oaths:

a. Failing to accurately account for the whereabouts or disposition of a Rolex watch;

b. Failing to disclose a $50,000 transaction with Chris Cioffi within one year of the filing of the bankruptcy case or to properly account for the disposition of the proceeds of that transaction;

c. Failing to disclose an interest the Debtor had in a real estate development known as the "Englewood Project" within one year of the filing of the bankruptcy case;

d. Failing to disclose approximately $70,000 in loan repayments within one year of the filing of the bankruptcy case to an affiliate known as Jet 1, Inc. ("Jet").

e. Failing to disclose approximately $70,000 in cash transfers within one year of the filing of the bankruptcy case not in the ordinary course of business to Jet.

f. Failing to disclose transfers in excess of $1,000,000 to Jet for the purpose of concealing those funds from the Defendant's creditors, and the existence of that transfer was concealed from the date that it occurred through the date of filing of this Chapter 7 case.

g. Failing to disclose an interest in a leasehold and in a deposit held by a landlord.

h. Failing to disclose loan repayments within one year of the filing of the bankruptcy case to an affiliate known as Jet 1 Charter, Inc. ("Charter").

i. Failing to disclose cash transfers within one year of the filing of the bankruptcy case not in the ordinary course of business to Charter.

j. Failing to disclose loan repayments within one year of the filing of the bankruptcy case to an insider, Jim Malone.

k. Failing to disclose transfers not in the ordinary course of business within one year of the filing of the bankruptcy case to Jim Malone.

l. Failing to accurately disclose $42,000 in payments to attorneys, all of which occurred within one year of the filing of the bankruptcy case, or to honestly account in the bankruptcy Statement of Financial Affairs fees paid to attorneys for advice concerning relief under the Bankruptcy Code.

m. Failing to accurately account for the true nature and extent of assets of affiliate or to truthfully account to the Chapter 7 trustee with respect to the assets, liabilities and prospects of affiliate entities.

n. Failing to accurately account for gambling debts and charitable contributions.

o. Failing to accurately disclose the transfer, within one year of the filing of the bankruptcy case, of $55,000 to the Defendant's IRA.

p. Failing to accurately disclose the true extent of the Defendant's assets, liabilities, and credit facilities.

q. Failing to accurately disclose all transactions in which he had an interest or which occurred for his benefit.

r. Failing to accurately disclose memberships in exclusive country clubs or the fact that those memberships were in the process of being liquidated.

(Complaint at 2–4.)

■ The purpose of § 727(a)(4)(A) is not punishment, but rather a protection to "insure that adequate information is available to the trustee and all interested parties." *In re Guthrie*, 265 B.R. 253, 263 (Bankr.M.D.Ala.2001). Or, stated differently, its purpose is to ensure that "those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." *In re Tully*, 818 F.2d 106, 110 (1st Cir.

1987). In order for a plaintiff to win under § 727(a)(4)(A), the false oath must be "both fraudulent and material." *Miller v. Burns (In re Burns)*, 395 B.R. 756 (Bankr. M.D.Fla.2008) (emphasis in original). The Court of Appeals for the Eleventh Circuit has held that a false oath is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.1984) (affirming denial of discharge even where no detriment to creditors was shown).

■ A false oath must be fraudulent; it "must be made intentionally." *In re Rudolph*, 233 Fed.Appx. 885 (11th Cir. 2007) (quoting *In re Cutignola*, 87 B.R. 702, 706 (Bankr.M.D.Fla.1988)). "Deliberate omissions" also may be cause to deny a discharge under this provision. *In re Chalik*, 748 F.2d at 618. However, the Debtor's "actual, subjective intent to hinder, delay, or defraud creditors must be demonstrated." *In re Cutignola*, 87 B.R. at 706. For example, the inexact valuation of assets, where the valuation represents a debtor's bona fide effort to value his own assets, does not amount to a false oath. *Kramer v. Poland (In re Poland)*, 222 B.R. 374, 381 (Bankr.M.D.Fla.1998). Intent to defraud may be inferred from "a series or pattern of errors or omissions [having] a cumulative effect giving rise to an inference of an intent to deceive." *In re Guthrie*, 265 B.R. at 263 (citations omitted).

■ A debtor's false statements and omissions in sworn bankruptcy schedules and statements may qualify as false oaths. *See, e.g., In re Keck*, 363 B.R. 193, 201 (Bankr.D.Kan.2007). Here, the majority of the allegations of false oath relate to omissions from the SOFA responsive to

Question 10, which requires the Debtor to list all property transferred, "other than property transferred in the ordinary course of the business or financial affairs of the debtor" within 2 years of the filing.

 Count II of the Complaint is based on alleged fraudulent transfers by the Debtor of his property within a year prior to the filing of the petition, *see* § 727(a)(2)(A). The specifically alleged fraudulent transfers are the following:

 a. Transferring tens of thousands of dollars of cash into improvements to the Defendant's home, for the purpose of shielding the resultant improvements from his creditors while the Defendant operated under a mistaken belief that the value of those improvements would be completely beyond the reach of his creditors. . . .

 b. Transferring tens of thousands of dollars in cash to affiliate entities in order to permit those entities to fund the Defendant's opulent lifestyle and to advance funds for the benefit of the Defendant while keeping those funds out of the Defendant's name and, thus, beyond the reach of the Defendant's creditors.

 c. Transferring $55,000 in cash to the Defendant's IRA while the Defendant operated under a mistaken belief that those funds would be beyond the reach of his creditors. . . .

(Complaint at 5.) Under § 727(a)(2)(A), a discharge may be denied if the debtor, "with the intent to hinder, delay, or defraud a creditor or an officer of the estate . . . has . . . concealed . . . property of the debtor, within one year before the date of the filing of the petition. . . ." The Eleventh Circuit has held that in order to successfully object to discharge under § 727(a)(2)(A), a creditor must establish:

(1) [T]hat the act complained of was done within one year prior to the date the petition was filed, (2) with *actual* intent to hinder, delay, or defraud a creditor, (3) that the act was that of the debtor, and (4) that the act consisted on (sic) transferring, removing, destroying, or concealing any of the debtor's property.

*Jennings v. Maxfield (In re Jennings),* 533 F.3d 1333, 1339 (11th Cir.2008) (emphasis added). The debtor's intent "may be established by circumstantial evidence or inferred from the debtor's course of conduct." *Id.* The Eleventh Circuit also held that the transfer of non-exempt assets into exempt assets is only fraudulent if the debtor is "motivated to make such a conversion by an actual intent to hinder, delay, or defraud his creditors." *Id.* at 1338. Additionally, the conversion of exempt assets of the debtor into other exempt assets generally cannot be grounds for denial of a discharge. *See Lippow v. Ed. Schuster & Co. (In re Lippow),* 92 F.2d 619, 621 (7th Cir.1937). In order to determine actual fraudulent intent, courts may look to the traditional badges of fraud. *In re Cornelius,* 333 B.R. 850, 860 (Bankr.N.D.Fla. 2005).

 The Plaintiff established at trial the existence of numerous substantial transfers between the Debtor and various corporations controlled by the Debtor within the two years prior to the filing. Whether these transfers were transfers of property of the debtor within a year of filing has not been established. The accounting methods of the Debtor's corporations do not lend themselves to transparency, and the testimony and evidence presented by the Plaintiff did little to elucidate. Nevertheless, while there is insufficient evidence to establish fraudulent transfer for purposes of denial of discharge under § 727(a)(2)(A), it was clear-

ly established that there were transfers of the Debtor's interests outside the ordinary course of business. While it may have been common for these companies to lend money to each other, the ordinary course of the Debtor's business cannot be considered so broad as to encompass all transactions, however large, involving money. The Debtor was in the charter air business. While he may warrant the title entrepreneur, that title does not shield him from the obligation to disclose the large sums flowing in and out of his accounts. The failure to disclose these transfers in the Debtor's schedules and statements, in *any* way, was clearly a material omission.

Within a year of the filing, the Debtor received a payment of $50,000 in exchange for his interest in a real estate investment controlled by Cioffi, known as the Englewood Project. This transaction was a transfer of the interest of the Debtor within a year of the filing. The Debtor originally invested $100,000 in the Englewood Project. The Plaintiff has argued (although not pled) that the transfer of his interest in exchange for $50,000 was a fraudulent transfer. However, the Plaintiff has failed to show that the transfer was made with fraudulent intent. The transfer appears, given the trends in the real estate market in west Florida, to have been a good business decision, and no evidence was presented indicating fraudulent intent at the time. However, the transfer was not disclosed in Question 10 of the SOFA or anywhere else in the Debtor's schedules or statements. The fact that this transaction was undocumented does not negate the Debtor's interest, or the obligation of disclosure. The failure to disclose this transfer of the Debtor's interest in exchange for $50,000 was clearly material.

A single investment in a real estate project is clearly not within the ordinary course of the Debtor's business.

At trial, the Court received evidence that the Debtor failed to disclose $23,500 in payments to attorneys within the year prior to filing.[4] The Plaintiff argued that these payments should have been disclosed under Question 9 of the SOFA. However, the Debtor credibly testified that these attorneys did not represent him in conjunction with his own bankruptcy proceeding. The Plaintiff has failed to present any evidence to credibly rebut that testimony. However, $23,500 in payments to attorneys qualifies as a transfer outside the ordinary course of business, in an amount that is clearly material. The Debtor's business was the charter air business, not litigation.

One of the Debtor's companies, Charter, uses leased commercial space. The lease is in the name of the Debtor individually, not in the name of Charter. The security deposit and first month's rent, in the amount of $3,090, were paid out of the Debtor's personal account. The Debtor did not list his interest in the security deposit in his schedules. The Debtor argues that it is common for debtors to fail to list security deposits in their schedules, and that the security deposit had been refunded by Charter. Nevertheless, the Debtor is personally the party to the lease. The failure to disclose the Debtor's interest, whatever it may be, in this commercial lease and security deposit, was a material omission. Finally, the Debtor listed $0 in entertainment expenses on his Schedule J. This statement was clearly false and material.

██ The Plaintiff has established that there are several material omissions in the

---

**4.** The Complaint alleged $42,000 in payments to attorneys, but the testimony only referenced $23,500, and no relevant exhibits were admitted.

Debtor's schedules and statements. However, in order for an omission to be the basis for a case under § 727(a)(4)(A), there must be a finding of actual intent to defraud on the part of the Debtor. *In re Cutignola*, 87 B.R. at 706. Only deliberate omissions qualify as false oaths justifying denial of the discharge. *In re Chalik*, 748 F.2d at 618. In this case, the Debtor has failed to disclose several substantial transfers and interests in property. The Court had the opportunity to observe the Debtor over the course of a two-day trial. The Debtor's testimony on these matters revealed a tendency to play "fast and loose" with his affairs. *See In re Tully*, 818 F.2d at 110. It further appears that he chose to play "fast and loose" with his disclosure obligations. Considering all facts in this case and the testimony of the Debtor at trial, it is the Court's conclusion that these material omissions were willful. As such, they constitute false oaths and are cause for denial of discharge under § 727(a)(2)(A).

The Debtor has argued in his defense that many of these omissions were made based on the advice of counsel. This Court has recently rejected this argument and does so again here. *See In re Trafford*, 377 B.R. 387, 391 (Bankr.M.D.Fla. 2007). In this case, the facts and circumstances clearly warrant the finding that the Debtor had actual fraudulent intent when he omitted these interests and transfers. Therefore, he cannot shield this intent behind a plea that he was merely following the advice of his attorney.

Secondly, the Debtor has argued that he met with the Trustee apart from the 341 meeting and explained several of these omitted transfers or interests. First, it is not clear from the testimony precisely what was disclosed to the Trustee. The meetings appeared generally to be an opportunity to open up the Debtor's books and records to the Trustee and provide explanation for any questions she might have. While this is certainly a good practice given the complexity of this case, it cannot substitute the requirement for full and accurate disclosure in the Debtor's schedules and statements. *See In re Petersen*, 323 B.R. 512, 517 (Bankr.N.D.Fla. 2005) ("Debtors must make full and complete disclosures on their bankruptcy schedules, and it is not up to a debtor to decide upon the relevance or value of assets or information before including it on his or her schedules.").

The Plaintiff presented evidence regarding numerous other alleged false oaths, some pled and some not, but has failed to establish the underlying facts necessary to sustain its case based on those omissions. First, no evidence was presented of any loan repayments or transfers outside the ordinary course of business made to Jim Malone. Secondly, while the Plaintiff elicited testimony regarding the sale of a Sea Ray boat, the Plaintiff did not present sufficient evidence to establish that the boat was transferred within two years of the filing. Thirdly, the Complaint alleges that the Debtor failed to disclose his interest in country club memberships and the fact that the memberships were in the process of liquidation. The Hideout Golf Club membership *was* disclosed in the Debtor's schedules, as was the conversion from equity to non-equity. The evidence established that any equity remaining in the surrendered Premier membership was an asset of Jet 1, Inc., and not of the Debtor. Fourthly, the Complaint alleges that the Debtor failed to accurately account for gambling debts and charitable contributions. The Plaintiff has failed to establish by a preponderance that the Debtor had any gambling debts to disclose. The Plaintiff presented no evidence at all relating to charitable contributions. Fifth-

ly, while not pled, the Plaintiff presented evidence indicating that the shotgun listed in the Debtor's schedules was under-valued. However, the Plaintiff failed to present credible evidence that the valuation of the shotgun was not the Debtor's bona fide effort to value the item. Mere inaccurate valuation is not a false oath. As such, the Plaintiff failed to sustain its burden. Finally, the failure to list the K–1 income for 2006 does not rise to the level of a false oath, because on the date of the petition, the tax forms calculating this amount had not yet been prepared. The Court will not infer fraudulent intent given that circumstance.

### C. Transfers of Exempt Property

■ Under § 727(a)(2), the conversion of non-exempt assets into exempt assets may constitute a fraudulent transfer. However, as aptly stated by the Seventh Circuit, "[i]t is impossible to conceive any logical ground upon which the conveyance of property not subject to the claims of creditors can be held to have been fraudulent." *In re Agnew*, 818 F.2d 1284, 1289–90 (7th Cir.1987). The Plaintiff has failed to show that the transfer of $55,000 from the Debtor's home equity line to the IRA was fraudulent. It appears to be a conversion of exempt assets into other exempt assets. The fact that the funding of the IRA may have resulted in these assets becoming non-exempt further highlights the point. The result of this transaction was to make more of the Debtor's assets available to creditors, not less.

■ The same is true for all transactions relating to the Debtor's homestead, including the purchase of and improvements to it. It is black-letter law in Florida that the proceeds of the sale of a homestead property are exempt where the individual intends to reinvest the proceeds into another homestead property. *Town*

*of Lake Park v. Grimes*, 963 So.2d 940, 943 (Fla. 4th DCA 2007). The Debtor's mistake, in using the funds received from the sale of his homestead for another purpose prior to re-investment, resulted in the partial loss of their exempt status. The conversion of exempt assets into non-exempt assets by inadvertence, with negative consequences to the Debtor, cannot be a fraudulent transfer. *In re Agnew*, 818 F.2d at 1290 (declining to reach "the odd conclusion that [the debtor] attempted to defraud his creditor by converting an exempt asset to a non-exempt asset"); *see also In re Short*, 188 B.R. 857, 860 (Bankr. M.D.Fla.1995) (following *Agnew* ).

### D. Removal or Destruction of Property of the Center Estate

■ Count IV of the Complaint is a challenge to discharge under § 727(a)(2)(B), based on allegations that the Debtor concealed or destroyed property of the estate of Center, an insider of the Debtor. Under § 727(a)(7), discharge may be denied where the debtor commits an act under the other provisions of § 727(a), "on or within one year before the date of the filing ... in connection with another case ... concerning an insider." § 727(a)(7). To establish a case under § 727(a)(2)(B), as applied under § 727(a)(7), a plaintiff must establish by a preponderance that (1) there was destruction or concealment, (2) within one year of the filing of the debtor's case, (3) of the property of the estate of an insider, (4) by the debtor, (5) with the intent to hinder, delay, or defraud creditors. *See In re Unger*, 333 B.R. 461, 470 (Bankr.M.D.Fla.2005).

■ The pleadings principally refer to the disposition of hundreds of gallons of jet fuel in connection with the Center case. At trial, the Plaintiff presented no evidence relating to the jet fuel. The only other incident pled in Count IV was that

"[i]n the days prior to the March 13, 2006, conversion of the Center case to Chapter 7, the Defendant stole and secreted property of the Center bankruptcy estate, and when confronted about the missing property, gave false information concerning the whereabouts of those assets." (Complaint at 8.) At trial, the Plaintiff presented evidence regarding the concealment or destruction of cabinet doors in the facilities used by Center. These acts were committed on the eve of relinquishment of the facilities to the Naples Airport Authority. While the evidence has established that the malicious destruction of property by the Debtor occurred, the Plaintiff has failed to establish a required element of its case—that the cabinet doors were, at that time, property of the Center bankruptcy estate. The evidence tends to indicate that Center had at most a leasehold interest in the facilities, and that the cabinet doors were fixtures. It is true that the concept of property of the estate is broad-reaching. *See In re Allavena,* 18 B.R. 527, 529 (Bankr.E.D.Pa.1982) (holding that the debtor's fraudulent transfer of a leasehold interest was cause for denial of discharge). However, while the Center estate may have had an interest in the facilities generally, the Plaintiff has failed to establish that the cabinet doors themselves were property of the Center estate. Accordingly, the Plaintiff failed to meet its burden.

### E. The Rolex Watch: Failure to Explain Loss of Assets, Failure to Maintain Financial Records, & False Oath

██ Count III of the Complaint is based on the failure "to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." § 727(a)(5). Two incidents were specifically pled. First, that the Debtor, "upon being confronted with the fact that he failed to account for his Rolex watch, failed at the 341 meeting and thereafter to satisfactorily explain the whereabouts of that watch or the alleged disposition of that watch." (Complaint at 6.) Second, that the Debtor "failed to explain the disposition of $7,000 in cash he obtained within six months of the filing of the bankruptcy." (*Id.*) The Eleventh Circuit has held that "[v]ague and indefinite explanations of losses" are unsatisfactory, but that "[t]he question of whether a debtor satisfactorily explains a loss of assets is a question of fact." *In re Chalik,* 748 F.2d at 619. The Plaintiff did not present evidence regarding the "missing" $7,000 in cash, but the Court would note that the Debtor credibly testified that he would carry large amounts of cash when flying charter aircraft.

██ Count V of the Complaint is based on the failure "to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." § 727(a)(3). The one specific incident pled in the Complaint is the Debtor's failure to "produce travel records which would verify the date of the alleged sale, a record of the money that changed hands or records concerning the whereabouts of the person to whom the watch was allegedly sold." (Complaint at 9.) This Court has previously noted that "the duty to keep books and records is not absolute and a failure to keep books and records may be justified depending on the circumstances." *Ins. Co. of N. Am. v. White (In re White),* 177 B.R. 110, 114 (Bankr.M.D.Fla.1994). This provision does not require a perfect accounting, but rather that the debtor "produce records that provide enough information to ascer-

tain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Union Planters Bank, N.A. v. Connors (In re Connors)*, 283 F.3d 896, 899 (7th Cir.2002) (citation omitted).

■ The Plaintiff advanced several theories in argument regarding the Rolex watch. The evidence established that the Debtor purchased the watch in 1983 and indicated that the Debtor no longer owned it on the date of the petition. As such, it would not have been an asset of the estate to be listed on the Debtor's schedules. The Debtor's story at all times in this case has been that he sold the watch on an unknown date, in an exchange for $1,500 cash, on a ski slope in Deer Valley, Utah. The evidence was unclear as to whether this sale occurred within two years of the petition. As such, the Plaintiff failed to establish that there was a material, willful omission amounting to a false oath. Further, the Debtor's explanation of the disposition of the Rolex watch, given at the 341 meeting and at trial, is satisfactory. The failure to keep and maintain records documenting the sale of the Rolex watch is justifiable under the circumstances testified to by the Debtor—namely the cash nature of the transaction and the fact that it was an exchange between acquaintances.

### CONCLUSION

Chapter 7 trustees and creditors must have adequate information about the affairs of a debtor to aid the trustee in the role of liquidating the assets of the estate for the benefit of creditors. *In re Petersen*, 323 B.R. at 517; *In re Guthrie*, 265 B.R. at 263. This Debtor chose not to provide a full disclosure, choosing instead

to play "fast and loose" with his affairs. *In re Tully*, 818 F.2d at 110. With fraudulent intent, this Debtor made deliberate omissions from his schedules and statements, constituting false oaths under § 727(a)(4)(A). Accordingly, he is not entitled to receive a Chapter 7 discharge.[5] A separate final judgment will be entered consistent with the foregoing.

---

**5.** There were several other items pled in the Complaint or argued in the post-trial briefs that the Court has chosen not to address, because insufficient evidence was presented . to merit review.